## DOMBOORAJIAN v. WOODRUFF.

1. EVIDENCE—MORTGAGES—FORECLOSURE—FRAUD—USURY—BURDEN OF PROOF.

   In a suit for an accounting and to enjoin the foreclosure of certain mortgages, where fraud and usury are charged, the burden is upon plaintiffs to prove their claims by a preponderance of the evidence.

2. CONSPIRACY—EVIDENCE—SUFFICIENCY.

   Evidence *held*, insufficient to show that defendants entered into a conspiracy to do plaintiffs a wrong.

3. USURY—UNLAWFUL AND CORRUPT INTENT NECESSARY ELEMENT.

   It is of the essence of a usurious transaction that there shall be an unlawful and corrupt intent on the part of the lender to take illegal interest.

4. SAME—PETTY CHARGES INSUFFICIENT.

   The payment by the borrower of a fee of one dollar for registering a $14,000 mortgage is too petty to sustain a charge of usury.

5. SAME—PAYMENT OF MORTGAGE TAX.

   The charge of usury based upon the claim that the borrower paid the $70 tax upon a mortgage for $14,000, *held*, not sustained by the evidence, which is convincing that the lender paid the tax.

6. SAME—CHARGE OF BONUS PAID NOT SUSTAINED.

   The charge that the borrower's agent in obtaining a loan received a bonus while he was in fact the agent of the lender, and that the latter was therefore guilty of usury, *held*, not sustained by the evidence.

---

[1]Evidence, 22 C. J. § 82; 23 C. J. § 1748; Fraud, 27 C. J. § 170; Usury, 39 Cyc. pp. 1051, 1055; 27 R. C. L. 268; 4 R. C. L. Supp. 1755; 5 R. C. L. Supp. 1469; 6 R. C. L. Supp. 1649; [2]Conspiracy, 12 C. J. § 234; [3]Usury, 39 Cyc. p. 919; 51 L. R. A. (N. S.) 465; 21 A. L. R. 875; 27 R. C. L. 235; 4 R. C. L. Supp. 1748; [4]Id., 39 Cyc. p. 946; [5]Id., 39 Cyc. pp. 1055, 1056; [6]Id., 39 Cyc. p. 1056.

*Continued from Vol. 238.

7. CANCELLATION OF INSTRUMENTS — MORTGAGES—CHATTEL MORT-
   GAGES.
   Where the evidence shows that $14,000 loaned for the
   purpose of building a post office, which was advanced
   from time to time as needed and secured by note and
   mortgage, was sufficient to include $1,000 advanced and
   paid for equipment, which was secured by the mortgage,
   an additional note and chattel mortgage given as security
   therefor should be canceled and returned to the borrower.

8. COSTS—ATTORNEY'S FEES—MODIFICATION OF DECREE.
   The decree of the court below allowing an attorney fee
   of $250 to one of the appellants against whom no case
   was made, is modified, on appeal, by eliminating said sum
   and allowing him his taxed costs in both courts.

Appeal from Ingham; Collingwood (Charles B.), J.
Submitted February 1, 1927.    (Docket No. 49.)    De-
cided June 6, 1927.

Bill by Benjamin Domboorajian and another against
Mark T. Woodruff and others for an accounting, and
to enjoin the foreclosure of certain mortgages.    From
a decree for defendants, plaintiffs appeal.    Modified
and affirmed.

*L. B. Gardner*, for plaintiffs.

*Frank L. Dodge* (*William M. Smith*, of counsel), for
defendants.

BIRD, J.    This bill was filed for an accounting and
other relief.    The accounting sought had reference to
a contract plaintiff made with defendant Woodruff for
building loans, and with defendant Wilcox, the build-
ing contractor.    The principal claim of plaintiff is
that he was charged a rate of interest that amounted
to usury.    At the hearing a large amount of testi-
mony was taken, at the conclusion of which the chan-
cellor filed an opinion which so nearly coincides with

⁷Cancellation of Instruments, 9 C. J. § 195; ⁸Costs, 15 C. J. §§
23, 248, 598.

our view of the case that we have adopted the opinion
as the opinion of this court:

"Benjamin Domboorajian is a citizen of the United
States although by birth an Armenian.   He has lived
many years in this country.   By occupation he is a
trader, dealing principally in Oriental rugs.   He is a
keen, active, educated man, speaking several languages,
including English, and he has a natural aptitude
for business.   During his years in America he has
conducted business with many men and women.   In
the latter part of 1922, he and his wife were owners
of a lot on Grand River avenue, East Lansing, de-
scribed as the west 41½ feet of the east 60½ feet
of lot 11, College Grove addition.   The property was
vacant and the Domboorajians were very desirous of
erecting a building on this lot to be rented for business
purposes.

"Benjamin Domboorajian secured a contract from
the Government for the lease of this prospective build-
ing as a post office for East Lansing.   The Domboor-
ajians had no ready money with which to build.   The
evidence shows that plaintiffs were in debt and hard
pressed for funds.   The Domboorajians were very
desirous of borrowing sufficient money to erect a build-
ing, offering as security only the lot and building as
it progressed.   The Domboorajians employed Wyllis
O. Dodge, a real estate broker, to negotiate the loan.
Mr. Dodge brought the Domboorajians in contact with
Mark T. Woodruff.   Mr. Woodruff was formerly a
banker in DeWitt, but had retired and had moved to
Lansing; at that time he was not engaged in any com-
pelling business.   Mark T. Woodruff and his wife,
Henrietta, entered into a contract with Benjamin
Domboorajian and his wife, Elizabeth.   This contract
provided that the Woodruffs should loan to the Dom-
boorajians the sum of $14,000 for the purpose of erect-
ing a building to be used as a post office in the city
of East Lansing.   The Domboorajians were to ex-
ecute a promissory note, with interest at seven per
cent., secured by a mortgage on the west forty-one
and one-half (41½) feet of the east sixty and one-
half (60½) feet of lot eleven (11) of College Grove
addition.   This agreement was dated the 30th day of
April, 1923.   It was also provided that plaintiffs

should make a contract with Charles S. Wilcox for the erection of the building and provided that payments should be made to the contractor.    In accordance with the above, a promissory note for $14,000 was given to the Woodruffs by the Domboorajians, secured by a mortgage on the lands described.

"The evidence in this case warrants the observation that this was a contract unusually favorable to plaintiffs.    The Domboorajians, whose only asset seemed to be title to the lot in question, and without any financial standing, were enabled to borrow sufficient money to equip a post office building in the city of East Lansing, which now has a value in excess of $30,000.    Mark T. Woodruff testified, and it was not disputed, that he provided and set aside sufficient funds so that the payments could be made according to the contract. Mark Woodruff did more than this, he entered into the building project as though it were his own.    Wyllis O. Dodge seemed to feel that his duty to the Domboorajians did not end when he had secured a party to loan the money but continued to advise with Mr. Domboorajian and, together with Mark T. Woodruff, spent considerable time in consultation and inspection of the building while it was in progress.    Mr. Domboorajian made frequent and somewhat insistent demands on Mark Woodruff's time and Woodruff apparently responded by giving his time and advice and in paying out the moneys as directed.

"Meantime Benjamin Domboorajian let a contract for the construction of this building to Charles S. Wilcox.    Mr. Wilcox was, and is now, post master of East Lansing and had previously had many years of experience as a building contractor.    At that time, April, 1923, Mr. Domboorajian was very friendly with Wilcox and expressed great confidence in his ability and integrity.    These four people, Benjamin Domboorajian, Mark T. Woodruff, Wyllis O. Dodge and Charles S. Wilcox worked in close harmony for some months.

"The post office building was hardly started when clouds appeared on the financial horizon of the Domboorajian sky.    They were building a home on another lot in another part of the city, and needed money to pay pressing obligations.    Less than a month after the date of the first contract, the Domboorajians employed Mr. Dodge, under a written contract of agency,

to use his good offices with Mark T. Woodruff to effect another loan on this house property.    Mr. Woodruff demurred, told Domboorajian that he did not want to loan money on nonincome producing property. After being importuned by Benjamin Domboorajian, Woodruff finally agreed to make a loan of $4,500 and on April 28, 1923, took a promissory note secured by a mortgage on the house property.    The money, $4,500, was furnished by the Woodruffs and paid out by Domboorajian to the several creditors.    The evidence shows that Woodruff and Dodge generally accompanied Domboorajian when these bills were paid. The building progressed and harmony generally prevailed until it came time to equip the post office.

"Prior to July 1, 1923, the Government had rented a post office building, fully equipped, from the Michigan Agricultural College.    The equipment, lock boxes, etc., were the property of the college.    The college authorities were desirous to sell and Domboorajian was desirous to buy this equipment.    In the contract of April 5th, it was agreed that out of the $14,000, a sufficient sum should be used to purchase this equipment.    As the date of removal approached, Mr. Wilcox as post master became anxious to have the new office ready for service.    Mr. Domboorajian agreed to pay the college authorities $1,000 for all the equipment, and this sum was procured from Woodruff and paid to the college, according to the agreement.    Woodruff, for some reason, desired to have a special lien on this equipment.    As a mutual friend and a party interested, Wilcox was consulted.    In his anxiety to get into the building he suggested that Domboorajian give to Mark T. Woodruff a note for $1,000 secured by a chattel mortgage on the equipment.    Wilcox drew the note and mortgage, they were produced in evidence and proved that the experience Wilcox gained as a building contractor did not make him a competent scrivener.    The chattel mortgage was afterwards placed of record in the office of the city clerk of East Lansing.    The post office equipment was moved by Wilcox and the post office began to function although the building was not completed.

"About the first part of July, 1923, Mr. Domboorajian began to consider the possibility of securing funds for the erection of a one-story building adjoin-

ing the post office on the east 16 feet of the ground which was covered by the first mortgage.

"Again Dombooorajian made a contract with Wyllis O. Dodge to secure the consent of Mark T. Woodruff to loan a sufficient amount for the purpose of this new building. The Woodruffs consented to make this new loan. The Dombooorajians gave a note for $5,000 secured by a mortgage on the land described in the $14,000 mortgage. A contract for the erection of the building was given to Charles S. Wilcox. This building, known as the 'annex,' was commenced at once. During its construction, however, certain changes were made which necessitated changing the plans of the post office building. During this period while the 'annex' was building, and the post office building was being completed, differences arose between the parties to this suit. Mr. Dombooorajian became suspicious of all the men with whom he was associated, Woodruff, Wilcox, and Dodge.

"Some of the conferences between Mr. Dombooorajian and the other men, either individually or collectively, were more or less acrimonious. It is not necessary to review the testimony relative to these meetings. It is sufficient to say that Mr. Dombooorajian's mind was filled with suspicion and distrust and that he sometimes failed to keep his temper or control his language. In the spring of 1924 the Woodruffs became apprehensive that the terms of the payment set forth in the several mortgages would not be met. There were several unsuccessful attempts to make an adjustment between the parties. . In July, 1924, the Woodruffs under the advice of counsel, started foreclosure proceedings. In August, 1924, plaintiff filed this bill, and later a stipulation was entered into by which a stay of the foreclosure proceedings was effected.

"It is the claim of plaintiffs that the transaction surrounding the $14,000 note and mortgage was tainted with fraud and that defendant Woodruff required plaintiffs to pay the mortgage tax and that therefore the note and mortgage was usurious. It is the further claim of plaintiffs that the note and mortgage for $4,500 was usurious, in that defendant Woodruff demanded and received a certain oriental rug, valued at about $100. It is the further claim

of plaintiffs that the note and mortgage of $5,000 was usurious in that the bonus paid to Wyllis O. Dodge, as agent for plaintiffs, was in reality a bonus paid to Mark T. Woodruff. It is the further claim of plaintiffs that in the settlement for interest plaintiffs furnished and defendant Woodruff accepted oriental rugs as a cash payment; that defendant did not credit plaintiffs with three months' interest paid in the rug settlement on the $5,000 note. It is the further claim of plaintiffs that the note for $1,000 and the chattel mortgage accompanying it was without consideration and should be canceled. Plaintiffs further claim that defendants, the Woodruffs, commenced foreclosure proceedings illegally and caused said plaintiffs great financial loss. Running through the case like a red thread, although not alleged in the bill, was the accusation that Wyllis O. Dodge, agent for the Domboorajians, was so friendly to Woodruff that he neglected his duty to his employers, the Domboorajians, and became a party to a general conspiracy whereby Mark T. Woodruff and Charles S. Wilcox sought to do the Domboorajians a grievous wrong to their financial loss.

"In regard to defendant Wilcox, it is the claim of plaintiffs that the post office and annex building was never completed according to contract and there is now due from said Wilcox large sums of money.

"It is elemental to say that the burden of proof is on the plaintiffs and that the plaintiffs must prove their claim by a preponderance of the evidence. The court has already indicated that there is no testimony which arises to the dignity of evidence to prove that the defendants or any of them entered into a conspiracy to do plaintiffs a wrong. The cases are numerous where unsophisticated parties have borrowed money and when an accounting was compelled, it was found that through extortion and fraud the little property the borrower may have had was gone and he was left hopelessly in debt to the money loaner. This is not such a case. Plaintiffs started with a lot on the main street of East Lansing, and borrowed $19,000 with which he erected two substantial buildings. One building known as the post office building is worth $30,000 or more, the other building, known as the annex, was sold for $16,000. Plaintiff

borrowed $4,500, giving a house and lot as security and the evidence shows that every cent of that money was paid on debts which had been contracted by plaintiffs and to the creditors, some of whom were threatening legal proceedings. The court, however, recognizes that even though fortunate circumstances may have given the property an increased value, plaintiffs are entitled to fair and honest treatment, and his claims of fraud should be patiently heard and carefully considered.

"Many witnesses were summoned who were examined and cross-examined at great length. There were many exhibits, the testimony is voluminous. Considering plaintiffs' claims *seriatim* and in detail, the court must start with the first transaction, the note and mortgage for $14,000.

"It is alleged that the contract was usurious in that the plaintiffs were compelled to pay the mortgage registration fee of one dollar and the mortgage tax of $70.

"In *Green* v. *Grant*, 134 Mich. 467, the court quotes with approval from *Condit* v. *Baldwin*, 21 N. Y. 221 (78 Am. Dec. 137) :

" 'It is the essence of a usurious transaction that there shall be an unlawful and corrupt intent on the part of the lender to take illegal interest, and so we must find before we can pronounce the transaction to be usurious.'

"Our courts in a long line of decisions have uniformly held that 'there must be an intent to do something in violation of the statute.' Here plaintiffs have borrowed $14,000 secured by a real estate mortgage. Did the payment by the borrower of a registry fee of one dollar taint the transaction with usury? The question really answers itself. Courts of equity are not concerned with petty matters.

"In *Fox* v. *Holcomb*, 32 Mich. 494, our court says:

" 'A court of equity always endeavors to shape its administration of relief in such a way as to avoid oppression or the entailment of consequence of unnecessary rigor.'

"Did defendant Woodruff require plaintiff Domboorajian to pay the mortgage tax of $70? After a careful review of all the evidence this court is convinced that Mark T. Woodruff paid the mortgage tax. Did

defendant Woodruff demand and receive a rug as a bonus for the loan of $4,500? There was no evidence which would justify such a finding. Did Wyllis O. Dodge, while employed and paid by Domboorajian receive a bonus for his services in obtaining a loan of $5,000 from Woodruff, while in fact he was the agent of Mark T. Woodruff? If he did this, Mark T. Woodruff in effect received a bonus for making the loan. There is no evidence which would justify such a finding. There being no evidence of anything in the nature of a bonus or other irregular payment, the question of usury is out of the case.

"There is no evidence that defendant Mark Woodruff paid any moneys to Charles S. Wilcox or any other person except in accordance with the several contracts or at the request of plaintiff Benjamin Domboorajian. The evidence shows that foreclosure proceedings were commenced by defendants, the Woodruffs, in a proper and legal manner. The evidence shows that when the post office equipment was purchased, Mark T. Woodruff furnished the money, $1,000, according to the terms of the contract of April 5th, and that the note and mortgage of $14,000 was given to pay for the same and was ample security for the same. It follows that the note and chattel mortgage for $1,000 should be released and returned to plaintiffs, the Domboorajians.

"The court finds that the several notes and real estate mortgages given as security are in due form and that the several indorsements on the individual notes are correct and that the indebtedness of plaintiffs can be determined by a simple computation. Inasmuch as defendants, the Woodruffs, should have released the $1,000 note and chattel mortgage to plaintiffs, no costs will be allowed against plaintiffs in their case.

"In regard to the defendant Charles S. Wilcox: The evidence is overwhelming and conclusive that a settlement was had of all the matters between Wilcox and the Domboorajians on October 27, 1924, and that said Charles S. Wilcox is not indebted to the Domboorajians in any amount."

In awarding costs, Judge Collingwood, who conducted the hearing, allowed defendant Wilcox an at-

torney fee of $250.    We think this allowance should be eliminated and instead defendant Wilcox be allowed his taxed costs in the trial court, and also in this court. Defendant Woodruff will also recover his costs in this court.

With these modifications, the decree will be affirmed.

Sharpe, C. J., and Snow, Steere, Fellows, Wiest, Clark, and McDonald, JJ., concurred.