## ABELOFF v. OHIO FINANCE CO.

1. USURY—EXAMINATION OF ENTIRE TRANSACTION—PURCHASE OF ACCOUNTS RECEIVABLE.

    The court must examine an entire transaction alleged to be usurious to determine, irrespective of its form, whether or not defendant's claimed purchase of accounts receivable for layaway or storage and repair of furs was in violation of the usury statute (2 Comp. Laws 1929, §§ 9239–9241).

2. SAME—STATUTES.

    It is necessary to establish usury that there be an intent to do something in violation of the usury statute (2 Comp. Laws 1929, §§ 9239–9241).

3. SAME—EVIDENCE—FUR RETAILER.

    Agreement providing for advancement of funds to fur retailer at a rate of interest in excess of that permitted by statute, secured by accounts of doubtful value and by a lien on goods which never left borrower's possession until the account receivable was paid in full, and for the substitution of new accounts for those which were not paid in full together with the withholding of a reserve, established the relation of borrower and lender, and not sales of accounts as claimed by defendant, hence the transaction was usurious (2 Comp. Laws 1929, §§ 9239–9241).

4. SAME—LEGAL INTEREST—EQUITY.

    While interest reserved in a usurious transaction would be void at law, where borrower is in a court of equity seeking relief from the agreement, the borrower, in order to do equity, was properly charged with interest at the legal rate of five per cent (2 Comp. Laws 1929, §§ 9239–9241).

Appeal from Wayne; Brennan (Vincent M.), J. Submitted October 9, 1945. (Docket No. 39, Calendar No. 43,125.) Decided March 4, 1946. Rehearing denied May 13, 1946.

Elements of usury, see 2 Restatement, Contracts, § 526 et seq.

Bill by Abe Abeloff and others, copartners doing business as Empire Fur Company and Atlas Fur Stores, against Ohio Finance Company, an Ohio corporation, to have obligation under written contracts declared satisfied, for cancellation of chattel mortgage and statutory damages. From decree entered, both parties appeal. Affirmed.

*Shapero & Shapero,* for plaintiffs.

*George E. Brand,* for defendant.

BUSHNELL, J.   On March 15, 1943, David Glanzrock and Abe Abeloff, copartners, doing business as the Empire Fur Company and Atlas Furs, entered into an agreement with defendant, the Ohio Finance Company, an Ohio corporation, "to sell certain accounts receivable, commonly known as 'layaways,' and certain accounts receivable arising from the storage and repair of furs and fur garments."

The agreement provided among other things for the creation of a "dealer's reserve" fund, the collection by the partnership of accounts at no cost to Ohio, and that all moneys collected would be held in trust and not commingled with the partnership funds, but turned over to Ohio not later than the next business day following the date of collection, together with a detailed report thereon. All papers covering the accounts sold were to be delivered to Ohio and all instruments covering payments thereon were to be assigned to it. The partnership ledger cards and other records were to be plainly marked, "Property of THE OHIO FINANCE COMPANY," and Ohio was permitted, during business hours, to examine all records pertaining to such accounts, and, if desired, without cost or expense to the partnership, Ohio's employees might be assigned "to assist in clerical or collection effort."

Accounts were not to be cancelled without written consent of Ohio, nor was the merchandise represented by an individual account to be delivered until such account was paid in full, except by written consent of Ohio. Upon cancellation of an account or consent delivery of merchandise prior to payment therefor in full, the partnership obligated itself to repurchase that account and pay Ohio the full unpaid balance thereon.

Ohio was designated as an agent of the partnership for the purpose of entering vaults or storage space to inspect the garments stored therein, which secured the payment of accounts. Ohio, under the agreement, retained out of the purchase price of each account "a sum equal to 20 per cent. of the unpaid ledger balance of each such account receivable," as of the date of such purchase. This retained amount was to be applied to the credit of the so-called "dealer's reserve." Upon failure of the copartnership to pay the full amount due on each account receivable on or before a date fixed in the agreement, it was understood that such account might be returned to the copartnership and the unpaid balance thereon deducted from the "dealer's reserve." Upon another date fixed in the agreement an adjustment was to be made of the "dealer's reserve," and if the balance in the reserve exceeded "the then total outstanding unpaid ledger balance of all accounts purchased," such excess was to be paid to the partnership. It was further agreed that if on such date the "dealer's reserve" was insufficient the partnership would deposit cash "to cause said 'dealer's reserve' to equal the then total outstanding unpaid ledger balance of all accounts purchased." Failure on the part of the partnership to receive any two consecutive calendar month payments on any instalment layaway account obligated

it to repurchase the account and pay Ohio the existing unpaid balance.

The partnership was permitted to collect in its own name the accounts in question, and Ohio was not obligated to purchase all accounts offered; nor was the partnership obligated to sell all of its accounts.   Suitable provisions were included in the agreement with respect to bankruptcy actions by or against the partnership, and the procedure, in event of cancellation of the agreement, was outlined.   It was specifically understood that Ohio should have "no control over or direction of any employee of the second parties who may engage in the collection of accounts receivable sold."

The agreement provided that the discount rate at which accounts were to be sold by the partnership and purchased by Ohio was to be mutually agreed upon.   Accordingly and contemporaneously with the execution of the agreement, Ohio set up in a letter, addressed to the partnership, and which it accepted, the terms under which the accounts were to be purchased.   Because of its importance, we quote the body of this letter:

"Until further notice, accounts receivable hereafter purchased from your company under the terms of our agreement dated March 15, 1943, which accounts arise from fur storage, fur repair and layaway sales, will be purchased by us in accordance with the following schedule:

| "Purchases in month of | Purchase ratio |
| --- | --- |
| March | 90% |
| April | 91% |
| May | 92% |
| June | 93% |
| July | 94% |
| August | 95% |
| September | 96% |
| Oct., Nov., Dec. | 97% |

"At the end of each month we will rebate to you a percentage of the total collections received by us during that month on accounts receivable purchased under the said agreement, said rebates for each month to be determined in accordance with the following schedule:

| "Collections in month of | Rate of rebate |
|---|---|
| March | 7% |
| April | 6% |
| May | 5% |
| June | 4% |
| July | 3% |
| August | 2% |
| September | 1% |
| Oct., Nov., Dec. | -0- |

"It is understood that this letter shall not affect any of the provisions, terms or conditions of the agreement referred to above."

On September 2, 1943, David Glanzrock and Abeloff, as copartners, sold and assigned the contract just referred to to their successors, "Abe Abeloff, David Glanzrock, Robert Gutterman and Sydney Glanzrock, partners, doing business under the trade names and styles of Empire Fur Company and Atlas Furs." This assignment was executed by all the new copartners, except Sydney Glanzrock, and Ohio gave its written consent to the assignment.

On October 29, 1943, Ohio entered into a new collection agreement with both Glanzrocks, Abeloff and Gutterman, in which the original agreement was substantially followed. However, this October agreement pertained to conditional sales contracts on which parties, in a letter of the same date, fixed a new and different ratio applicable thereto.

A new discount agreement was executed on November 26, 1943, modifying in part the October agreement and a new "purchase ratio" letter was signed and accepted so as to include that agreement,

without any change in the rates. A subsequent collection agreement was executed on the same date. A new general agreement to replace the one of March 15th was executed on January 10, 1944, with a new rate on "purchases" appended thereto and a new rate of "rebates."

In February of 1944 the reserve was increased to 30 per cent. and a supplementary agreement, dated May 23, 1944, increased the reserve rate to 45 per cent. There was also an agreement of May 20, 1944, authorizing the deduction of a 40 per cent. reserve on charge layaway accounts receivable purchased as of May 17, 1944.

The above substantially describes the original and modified transactions between plaintiffs as "sellers" and the defendant as "purchaser" of the accounts in question.

On March 16, 1945, plaintiffs amended their bill of complaint as follows:

"By striking and withdrawing therefrom all agreements dated October 29, 1943, and November 26, 1943, and all reference to said agreements dated October 29, 1943, and November 26, 1943."

This effectively disposed of all claims theretofore made respecting conditional sales transactions.

In plaintiffs' bill of complaint, filed on March 14, 1945, relief was sought on the ground that the negotiations prior to the original agreement of March 15, 1943, and the terms of the agreement itself, contemplated and constituted "a loan from the defendant, to be secured by a lien and assignment upon accounts receivable belonging to Atlas Fur Stores, said accounts receivable arising out of layaway sales by plaintiffs to its customers of furs and fur garments, fur storage and fur repairs."

Plaintiffs charged in their bill that the agreements of March 15, 1943, "were drafted by defendant and

were made in the form of a purchase and sale of accounts only as a device to evade the true nature of the transaction as a loan by defendant to plaintiffs, and as a device to evade the usury statutes of the State of Michigan, and to conceal the usurious nature of said transaction."

The bill treats the 1944 agreements as a refinancing operation and avers that during the period covered by all of the agreements, advances and loans were made to plaintiffs totaling $285,476.57, "that being the net balance after defendant had deducted a total of $42,211.93 as advance interest; that plaintiffs have paid, or caused to be paid, in actual cash to defendant to apply upon said advances, $285,886.99; that plaintiffs have received from defendant in the form of interest rebates $5,774.91."

Plaintiffs averred that, because the rate of interest reserved, taken and received, was in excess of seven per cent., as permitted by law, Ohio is not entitled to collect any interest whatsoever. It is stated in the bill of complaint that on or about January 15, 1945, defendant, claiming a default under the agreement, made a demand for the balance of the face amounts of the accounts covered, aggregating $137,103.80, upon which defendant had a reserve of $94,995.38, making a net balance claimed to be due of $42,108.42. It was averred that plaintiffs had tendered to Ohio the sum of $6,200, which was claimed to be sufficient to discharge "its lien and chattel mortgage," and when this tender was refused by Ohio, this sum was deposited in the bank for its use and benefit.

Plaintiffs sought relief by way of discharge of liens upon the accounts involved and a decree declaring that the chattel mortgage upon layaway garments had been fully satisfied. They also sought injunctive relief with respect to the collection of ac-

counts and statutory damages of $25, and double costs, in accordance with 3 Comp. Laws 1929, § 13433 (Stat. Ann. § 26.952). Defendant in its answer admitted the execution of the agreements herein referred to, but specifically denied the contemplation or existence of a loan, and insisted that the transactions constituted a sale of accounts. It denied the existence of a chattel mortgage and plaintiffs' right to relief under its bill of complaint.

Prior to the trial of the cause the *status quo* was preserved by a restraining order and the appointment by the court of representatives of both parties as trustees to handle collections and the disbursement of the proceeds thereof. Shortly before the trial, plaintiffs' bill was amended to include a prayer for relief, "under general equity jurisdiction by reason of the inadequacy of any remedy at law."

Extensive testimony was taken and many exhibits received covering the entire conduct of the business of plaintiffs and the handling of the transactions between them and defendant, the Ohio Finance Company.

Findings of fact and conclusions of law prepared by plaintiffs were adopted by the trial court and filed contemporaneously with the entry of a final decree on June 18, 1945. In substance, the court determined that the agreements, as modified, and the assignments of accounts executed pursuant thereto, "are loan transactions," entered into in order to secure defendant for advances made to plaintiffs, and "are not purchase and sales transactions, as they purport to be." The court further found that the interest reserved by the instruments in question was in excess of seven per cent. per annum, and in violation of the usury statutes of this State, viz., 2 Comp. Laws 1929, §§ 9239–9241 (Stat. Ann. §§ 19.11–19.13), and that, by reason thereof, such interest

was void and could not be recovered by the defendant. The court, however, found that, having come into equity, plaintiffs were required to do equity, and imposed upon them, as a condition to receiving equitable relief, that they must pay to defendant the interest on all moneys received from it at the rate of five per cent. per annum during the time such funds remained in plaintiffs' hands and were not repaid to defendant. From the sum of $12,672.74 in the hands of the court's trustees, plaintiffs were ordered to pay to defendant the sum of $5,965.64. Releases, reassignments, and discharges were decreed; Ohio was enjoined from interfering with plaintiffs' collection of the accounts in question, and the remainder of the trust account was ordered paid to plaintiffs, who were also awarded costs.

Both parties have appealed. Plaintiffs' appeal is based primarily upon the court's determination that they should pay defendant legal interest totaling $5,965.64. They also argue that the partnership is entitled to a discharge of the claimed "chattel mortgage." Subsequent to appeal to this court a stay was granted to defendant, and plaintiffs now urge that the procurement of such stay bars defendant from obtaining legal interest even though it otherwise would have been so entitled.

Defendant seeks reversal of the decree of the trial court on the ground that the trial judge erred in determining that plaintiffs established that the transactions in question were loans and not purchases. It denied that the trial court possessed equitable jurisdiction to grant relief against usury where no action had been brought upon the contract claimed to be usurious; that payment of legal interest is a prerequisite to equitable relief; and, in any event, plaintiffs are not entitled to relief against claimed usury as to all of the layaway accounts receivable,

assigned to Ohio in 1943 and 1944. It also urges recognition of the rule that the hearing in this court is *de novo,* notwithstanding the argumentative nature of the findings of fact and conclusions of law adopted by the trial court.

The decisive question in the case is whether the transactions in question were loans or sales of accounts.

At the outset, we are confronted with the requirement of examining the entire transaction. *Patterson* v. *Albert,* 267 Mich. 40. It is elementary that in such an examination we are not bound by the form of the transaction, and that, notwithstanding how it may be characterized by the parties in their written agreement, its real nature must be determined from all of the facts and circumstances. In a situation involving the requirement that the borrower pay a mortgage tax in addition to the interest permitted by statute, the court said in *Domboorajian* v. *Woodruff,* 239 Mich. 1:

"Our courts in a long line of decisions have uniformly held that 'there must be an intent to do something in violation of the statute.'"

In that case it was held that courts of equity are not concerned with petty matters. However, the situation in the instant case goes far beyond that of a petty matter. The agreements disclose a well planned course of action, designed to circumvent the statutes forbidding the taking of interest in excess of seven per cent. per annum, by the repeated characterization of the transaction as sales of accounts. Stripped, however, of all of its technical refinements, the testimony clearly shows that the actual relationship between the parties was that of borrower and lender. The agreement provided for the advancement of funds, secured by accounts,

many of which, because of their nature, were of doubtful value, and the further protection of a lien on the goods involved in such accounts, much of which never left the possession of the seller until the account was paid in full and the substitution of new accounts for those which failed to ripen into full payment.

Notwithstanding the attempt of defendant to distinguish the facts in *Home Bond Co.* v. *McChesney,* 239 U. S. 568 (36 Sup. Ct. 170, 60 L. Ed. 444), the situation there is analogous to the one here. In that case it was urged that where a contract is fairly open to two constructions, by one of which it would be lawful and by the other, unlawful, the former must be adopted, and that courts should construe an agreement so as to give it a legal effect rather than a usurious one. The court brushed aside such arguments and upheld the finding of the special master that an agreement for the sale and purchase of accounts receivable at a discount in excess of the legal rate of interest and the withholding of a reserve constituted, in fact and in law, loans at usurious rates of interest. The supreme court in that case quoted with approval from the opinion of the district court as follows:

"The considerations which support this conclusion are that the bankrupts were to and did collect the accounts and bear all expenses in connection with their collection; what is claimed to have been the purchase price for the accounts, to-wit, the difference between the face of the accounts and the discount, was not known until payment of the account and receipt thereof by the company, and then depended on the time that had elapsed since the date of the advance of the 75 per cent.; what is claimed to have been deferred payment of the purchase price was simply a return to the bankrupt of the excess of the collection over and above the advance and

discount; and the provision that, in the event of non-payment of any of the accounts at maturity, or the debtor becoming insolvent, the bankrupt should repurchase the account and pay therefor the advance made thereupon, plus the discount. * * * In so far as the contracts in question here use words fit for a contract of purchase, they are mere shams and devices to cover loans of money at usurious rates of interest.''

It is true that the transactions in the cited case were somewhat different in nature from those in the instant case, but they are sufficiently similar to justify the application of the rule enunciated therein.

It is argued that, because plaintiffs have freely and of their own accord fulfilled the claimed usurious contract, they are not entitled to relief. However, they have sustained the burden of proof that the agreement in question and the transactions arising therefrom were, in fact and in law, loans and not sales of accounts, and that the agreements were drafted with the intent and purpose of circumventing the usury laws of this State. Such being our conclusion, the interest reserved thereunder would be void, save for the fact that plaintiffs have sought equitable relief, and they were, under the circumstances, properly required to do equity by the payment of the legal rate of interest of five per cent.

In view of our conclusion, we do not deem it necessary to discuss the other matters raised in the exhaustive briefs of the respective parties.

The decree is affirmed, with costs to plaintiffs.

BUTZEL, C. J., and CARR, SHARPE, BOYLES, REID, NORTH, and STARR, JJ., concurred.