# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

SOARING PINE CAPITAL REAL ESTATE AND DEBT FUND II, LLC v PARK STREET GROUP REALTY SERVICES, LLC

Docket No. 163320. Argued on application for leave to appeal January 12, 2023. Decided June 23, 2023.

Soaring Pine Capital Real Estate and Debt Fund II, LLC, brought an action in the Oakland Circuit Court against Park Street Group Realty Services, LLC; Park Street Group, LLC; and Dean J. Groulx, alleging multiple counts of breach of contract and fraud. Soaring Pine, a nonbank investment group, had lent Park Street $1 million to "flip" tax-foreclosed homes in Detroit, i.e., to acquire such homes, renovate them, and then sell them for a profit. The mortgage note for this loan had a stated interest rate of 20%, but there were fees and charges associated with the loan that, if considered interest, pushed the effective interest rate above 25%. The mortgage note also contained a provision—called a usury savings clause—stating that the note should not be construed to impose an illegal interest rate. After paying more than $140,000 in interest on the loan, Park Street discontinued further payments. Soaring Pine then brought this action. Park Street argued that Soaring Pine violated the criminal usury statute, MCL 438.41, by knowingly charging an effective interest rate exceeding 25% and therefore was barred by the wrongful-conduct rule from recovering on the loan. Soaring Pine countered that the fees and charges associated with the loan were not interest and that the note had a usury savings clause that prevented it from charging a usurious rate. Soaring Pine further argued that, assuming it had engaged in criminal usury, it could still recover the loan principal and would only be precluded from collecting the interest.

Both parties moved for summary disposition. The circuit court, Martha D. Anderson, J., granted in part and denied in part both parties' motions for summary disposition. The court agreed with Park Street that the purported fees and expenses tied to the loan were really disguised interest and that, with this interest included, Soaring Pine was seeking to collect an interest rate above 25%. The court further held that there was no question of fact that Soaring Pine charged a criminally usurious interest rate in violation of MCL 438.41. However, the court agreed with Soaring Pine that the usury savings clause was enforceable and therefore the note itself was not facially usurious. Finally, the court agreed that the appropriate remedy was to relieve Park Street of its obligation to pay the interest on the loan but not its obligation to repay the principal.

Both parties filed interlocutory applications for leave to appeal challenging different aspects of the circuit court's decision. The Court of Appeals granted both applications and

affirmed. 337 Mich App 529 (2021). The Court of Appeals, MURRAY, C.J., and JANSEN and STEPHENS, JJ., held that the usury savings clause in the parties' mortgage note was enforceable and that, read together with a stated interest rate below the legal limit, the note was not facially usurious. However, it held that Soaring Pine nonetheless violated the criminal usury statute by seeking to collect through this lawsuit an effective interest rate above the statutory maximum. Both parties sought leave to appeal in the Supreme Court, and the Supreme Court ordered oral argument on the applications. 509 Mich 875 (2022).

In an opinion by Justice CAVANAGH, joined by Chief Justice CLEMENT and Justices BERNSTEIN, WELCH, and BOLDEN, the Supreme Court, in lieu of granting leave to appeal, *held*:

In determining whether a loan agreement imposes interest that exceeds the legal rate, a usury savings clause is ineffective if the loan agreement otherwise requires a borrower to pay an illegal interest rate; this is so even if some of the interest is labeled something else, such as a "fee" or "charge." Additionally, seeking to collect an unlawful interest rate in a lawsuit, standing alone, is insufficient to trigger criminal liability under Michigan's criminal usury statute, MCL 438.41.

1. Courts have a duty to refuse to enforce a contract that is contrary to public policy. In identifying the boundaries of public policy, courts look to the policies that have been adopted by the public through various legal processes and that are reflected in the state and federal Constitutions, Michigan statutes, and the common law. Usury is, generally speaking, the receiving, securing, or taking of a greater sum or value for the loan or forbearance of money, goods, or things in action than is allowed by law. The public policy behind Michigan's usury statutes is to protect borrowers from excessive interest rates imposed by lenders. Michigan's anti-usury scheme seeks to further this goal in five basic ways. First, Michigan statutes impose bright-line interest-rate ceilings on certain loans. Second, the lender has the primary burden to ensure that a loan's interest does not exceed that ceiling. Third, Michigan courts look beyond the parties' labels when determining whether an illegal interest rate has been imposed. Fourth, a borrower is entitled to the statutory remedy for usury even if the lender did not intend to impose an illegal interest rate. Finally, Michigan statutes provide for both civil and criminal punishment of lenders who impose an illegal interest rate.

2. In this case, Soaring Pine argued that the primary purpose behind Michigan's usury laws—to protect the necessitous borrowers from extortion—did not apply to business entities and sophisticated borrowers involved in high-value commercial transactions. However, the categorical distinction between "sophisticated" commercial business entities and other borrowers is not clearly reflected in Michigan's usury statutes or the accompanying caselaw. Soaring Pine also argued more broadly that there existed no coherent public policy behind Michigan's usury laws given the proliferation of statutory exemptions to usury and the disparate treatment of different kinds of loans. However, regardless of any gaps or uncertainty in the statutory scheme, where usury protections do apply, the public policy is to protect borrowers from unlawful interest rates by placing the primary burden on lenders to ensure that loans are not usurious. That public policy could not be ignored simply because it is arguably imperfectly applied or arguably should be extended to additional circumstances. The Court of Appeals failed to recognize that the usury statutes need not explicitly prohibit usury savings clauses for such clauses to violate public policy. The Court of Appeals also failed to appreciate that the general rule of enforcing contracts as written must yield to the public policy reflected by the usury statutes and that the public policy of

protecting borrowers reflected in these statutes would be significantly undermined if usury savings clauses were enforceable in all circumstances.

3. In view of this public policy, usury savings clauses are unenforceable when they nullify the statutory remedies for usury, thereby relieving lenders of their duty to ensure that loans are not usurious. It would be contrary to public policy to enforce a usury savings clause if the interest provided in the loan agreement is otherwise facially usurious at the time of contracting. This holding applied not only to the criminal usury statute but also applied to determinations of whether a note is usurious for the purpose of the civil usury statutes. Additionally, this holding was limited to whether a note imposes a usurious interest rate notwithstanding a usury savings clause. The circuit court was tasked on remand with addressing whether the loan in this case was subject to any usury protections or whether the note in this case was facially usurious.

4. MCL 438.41 provides that it is a crime if a lender knowingly charges, takes, or receives a usurious interest rate. In this case, the Court of Appeals seemed to view Soaring Pine's civil collection action as an attempt to "take" or "receive" a usurious interest rate, which was, at best, a strained interpretation of MCL 438.41. This was not a situation in which a lender had actually received a usurious interest rate via a lawsuit through fraud on the court or otherwise. Rather, it was the mere act of seeking such recovery through this lawsuit that the lower courts held was a crime.

5. The statutory language did not clearly indicate that the Legislature intended to impose criminal liability for this behavior alone. This conclusion was further supported by the public policy favoring resort to the legal system. Imposing criminal liability for simply seeking relief in court would chill both free access to the courts and the ability of attorneys to seek a legal remedy for their clients. Finally, the lower courts' interpretation of MCL 438.41 would undermine the statute's purpose of protecting borrowers. The practical result of potential criminal liability for bringing a civil collection action would be to discourage lenders from invoking the judicial process to recover unpaid debts, raising the specter that lenders would instead engage in self-help or other less-savory collection methods. Seeking to collect a usurious interest rate in a civil collection action, standing alone, is not a criminal offense for usury under MCL 438.41 and therefore cannot form the basis for invoking the wrongful-conduct rule when defending a civil action. This holding was consistent with both (1) the language of the criminal usury statute read in light of the interpretive principle that conduct which would result in a criminal conviction must be clearly stated and (2) the public policy favoring resolution of disputes through the legal system.

6. The lower courts erred by holding that Soaring Pine violated the criminal usury statute in this action. Additionally, these courts applied an incorrect standard when determining whether the note in this case was usurious. Neither lower court addressed whether Soaring Pine had committed any other act that violated the criminal usury statute, so that issue was left for the circuit court to consider on remand.

Circuit court and Court of Appeals decisions reversed to the extent that they are inconsistent with these holdings; remainder of the circuit court and Court of Appeals decisions vacated; case remanded to the Oakland Circuit Court for reconsideration in light of this opinion.

Justice VIVIANO, joined by Justice ZAHRA, concurring, agreed with the majority's holdings and the standard it adopted with regard to the enforceability of usury savings clauses but wrote separately because he did not believe that the majority's extended analysis of Michigan's usury laws and the broad purposes they serve was necessary in this case.

Justice WELCH, concurring, agreed with the majority that Michigan statutes impose a bright-line interest-rate ceiling on certain loans and that where usury protections do apply, the public policy of this state is to protect borrowers from unlawful interest rates by placing the primary burden on lenders to ensure that loans are not usurious. She also agreed with the majority's analysis as to when usury savings clauses can or cannot be used. She wrote separately to note the incongruent result that courts are potentially forced to reach due to the Legislature's choices and carveouts for certain entities that have historically charged extremely high interest rates. She noted that Michigan law mandates protection of sophisticated borrowers like Park Street while thousands of Michigan consumers are subject to a cycle of debt due to high-interest loans provided by businesses that have been exempted from the usury laws. Justice WELCH encouraged the Legislature to review the usury carveouts and determine whom it intends to protect.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED  June 23, 2023

S T A T E   O F   M I C H I G A N

SUPREME COURT

SOARING PINE CAPITAL REAL
ESTATE AND DEBT FUND II, LLC,

      Plaintiff/Counterdefendant-
      Appellee/Cross-Appellant,

v                             No. 163320

PARK STREET GROUP REALTY
SERVICES, LLC, PARK STREET GROUP,
LLC, and DEAN J. GROULX,

      Defendants/Counterplaintiffs-
      Appellants/Cross-Appellees.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

This case involves Michigan's longstanding prohibition on excessive interest rates for certain loans (known in legal circles as "usury laws").  We take this opportunity to resolve two issues of first impression under Michigan usury law.

The first issue is whether a court may enforce a "usury savings clause," i.e., a contractual term requiring a borrower to pay the maximum legal interest rate if the court determines that the other contractual terms impose an illegal interest rate. We hold that in determining whether a loan agreement imposes interest that exceeds the legal rate, a usury savings clause is ineffective if the loan agreement otherwise requires a borrower to pay an illegal interest rate. This is so even if some of the interest is labeled something else, such as a "fee" or "charge." Enforcing a usury savings clause in this circumstance would undermine Michigan's usury laws because it would nullify the statutory remedies for usury, thereby relieving lenders of the obligation to ensure their loans have a legal interest rate. In short, "[a] lender cannot avoid the consequences of contracting for a usurious interest rate simply by including a savings clause in the contract." *Armstrong v Steppes Apartments, Ltd*, 57 SW3d 37, 47 (Tex App, 2001).

The second issue is whether a lender commits a crime if they seek to collect an unlawful interest rate in a lawsuit. We hold that seeking to collect an unlawful interest rate in a lawsuit, standing alone, is insufficient to trigger criminal liability under Michigan's criminal usury statute, MCL 438.41. The Legislature did not intend to criminally punish a lender for up to five years in prison for merely invoking the judicial process to collect on a debt. Seeking relief in a court of law—rather than through extrajudicial means—is generally encouraged, not punished with a felony conviction. The appropriate remedy for a lender's abusive lawsuit is success for the borrower in that lawsuit and appropriate civil sanctions, not a criminal conviction for usury.

We reverse the decisions of the Court of Appeals and the Oakland Circuit Court to the extent that they are inconsistent with these holdings, vacate the remainder of those

2

decisions, and remand this case to the circuit court for reconsideration in light of this opinion.

## I. FACTS & PROCEDURAL HISTORY

Plaintiff, Soaring Pine Capital Real Estate and Debt Fund II, LLC (Soaring Pine), is a nonbank investment group that lent defendant Park Street Group Realty Services, LLC (Park Street)[1] $1,000,000 to "flip" tax-foreclosed homes in Detroit, i.e., to acquire such homes, renovate them, and then sell them for a profit.[2] The mortgage note for this loan had a stated interest rate of 20%, but there were fees and charges associated with the loan that, if considered interest, pushed the effective interest rate above 25%. The mortgage note also contained a provision stating that the note should not be construed to impose an illegal interest rate.[3] The parties and lower courts refer to this provision as a "usury savings clause."

---

[1] Park Street Group, LLC, and Dean J. Groulx are also defendants in this action. The claims against these defendants are, for our purposes, materially indistinguishable from the claims against Park Street Group Realty Services, LLC. Accordingly, for ease of reference, this opinion will refer to all defendants collectively as "Park Street."

[2] Soaring Pine distributed the principal in two $500,000 payments pursuant to separate loan agreements and mortgage notes. The relevant terms in each set of documents are the same, so this opinion uses the singular "note" and "loan."

[3] In full, this provision provided:

> **5. Interest Limitation.**
>
> Nothing herein contained, nor any transaction relating thereto, or hereto, shall be construed or so operate to require the Borrower [Park Street] to pay, or be charged, interest at a greater rate than the maximum allowed by the applicable law relating to this Note. Should any interest or other charges, charged, paid or payable by the Borrower in connection with this Note, or any other document delivered in connection herewith, result in the charging,

3

After paying more than $140,000 in interest on the loan, Park Street discontinued further payments. Soaring Pine sued, alleging multiple counts of breach of contract and fraud.[4] The parties eventually filed cross-motions for summary disposition under MCR 2.116(C)(10). Park Street argued that Soaring Pine violated the criminal usury statute by knowingly charging an effective interest rate exceeding 25% and therefore is barred by the wrongful-conduct rule from recovering on the loan. See MCL 438.41.[5] Soaring Pine

---

compensation, payment or earning of interest in excess of the maximum allowed by the applicable law as aforesaid, then any and all such excess shall be and the same is hereby waived by the holder, and any and all such excess paid shall be automatically credited against and in reduction of the principal due under this Note. If Lender [Soaring Pine] shall reasonably determine that the interest rate applicable to this Note (together with all other charges or payments related hereto that may be deemed interest) stipulated under this Note is, or may be, usurious or otherwise limited by law, the unpaid balance of this Note, with accrued interest at the highest rate then permitted to be charged by stipulation in writing between Lender and Borrower, at the option of Lender, shall become due and payable thirty (30) days from the date of such determination.

[4] Park Street counterclaimed with its own breach-of-contract and fraud claims. Those claims are not implicated in this appeal.

[5] As discussed later, there are civil usury statutes that provide a borrower a defense to a civil collection action. See MCL 438.31 to MCL 438.32; cf. MCL 438.61(3); MCL 450.4212. If a borrower shows that a lender assessed an interest rate exceeding the statutory maximum, the lender is precluded from collecting any interest owed on the loan. MCL 438.32. Park Street has not invoked a civil usury defense in this action. Rather, Park Street argues that Soaring Pine committed criminal usury under MCL 438.41 and therefore is precluded from recovering both the interest and principal on the loan under the wrongful-conduct rule. Generally stated, the wrongful-conduct rule precludes one from maintaining a civil action if "in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party." *Orzel v Scott Drug Co*, 449 Mich 550, 558; 537 NW2d 208 (1995) (quotation marks and citation omitted). Thus, in appropriate circumstances, a party in a civil action may argue that the opposing party

countered that the fees and charges associated with the loan are not interest and, regardless, the note has a usury savings clause that prevents it from charging a usurious rate. Soaring Pine further argued that, assuming it had engaged in criminal usury, it can still recover the loan principal and would only be precluded from collecting the interest.

The circuit court granted in part and denied in part both parties' motions for summary disposition. The court agreed with Park Street that the purported fees and expenses tied to the loan are really disguised interest and that, with this interest included, Soaring Pine is seeking to collect an interest rate above 25%.[6] The court further held that there was no question of fact that Soaring Pine charged a criminally usurious interest rate in violation of MCL 438.41. However, the court agreed with Soaring Pine that the usury savings clause is enforceable and therefore the note itself is not facially usurious. Finally, the court agreed that the appropriate remedy is to relieve Park Street of its obligation to pay the interest on the loan but not its obligation to repay the principal.[7]

---

committed a criminal act that precludes all or part of the relief they are seeking. We do not address this doctrine further or how it might apply in this case.

[6] The lower courts found that the interest rate was 20% based on a 360-day year, or slightly above 20% based on a 365-day year. There were also $50,000 in "upfront" fees that the trial court considered to be interest—pushing the interest rate to slightly above 25%. Beyond that, there was $11,506.85 in accrued interest on the first $500,000 installment due at the time of signing for the second installment, $1,000 per house in "success fees" due on the sale of each house, and various legal fees and payments for otherwise-permissible services that were already accounted for in other places of the loan document. As stated later in this opinion, we do not make factual findings here as to what constitutes or does not constitute interest. That determination should be revisited on remand.

[7] The circuit court set the issue of the amount of principal owed for trial and precluded Soaring Pine from submitting evidence of Park Street's alleged fraud. The trial has been stayed pending resolution of these appeals.

Both parties filed interlocutory applications for leave to appeal challenging different aspects of the circuit court's decision. The Court of Appeals granted both applications and affirmed. *Soaring Pine Capital Real Estate & Debt Fund II, LLC v Park Street Group Realty Servs, LLC*, 337 Mich App 529; 976 NW2d 674 (2021). Relevant for our purposes, the Court of Appeals held that the usury savings clause in the parties' mortgage note is enforceable and that, read together with a stated interest rate below the legal limit, the note is not facially usurious. *Id*. at 540-547. However, it held that Soaring Pine nonetheless violated the criminal usury statute by "seeking to collect ('take or receive') through this lawsuit an effective interest rate above the statutory maximum." *Id*. at 551, quoting MCL 438.41.[8]

Both parties sought leave to appeal in this Court, and in lieu of granting leave to appeal, we ordered oral argument on the applications. We directed the parties to address

> (1) whether a usury-savings clause is void as a violation of public policy; (2) whether the plaintiff violated the criminal usury statute, MCL 438.41, by seeking to collect on the contract in court or by engaging in any other acts that violated the statute; and (3) if the plaintiff violated MCL 438.41, whether it is barred by the wrongful conduct rule from recovering the principal on the

---

[8] The Court of Appeals held that the contract's $50,000 in "upfront" fees was, in actuality, disguised interest and that this purported fee pushed the effective interest rate above the legal limit. *Soaring Pine Capital Real Estate & Debt Fund II, LLC*, 337 Mich App at 546-551. The Court of Appeals declined to address the circuit court's holding that other fees also constituted interest. *Id*. at 551 n 8. Further, the Court of Appeals agreed with the circuit court that Soaring Pine should be precluded from recovering the interest but was still allowed to recover the principal. *Id*. at 551-556. In reaching this conclusion, the Court of Appeals held that there was no question of fact that Soaring Pine "knowingly" charged a usurious interest rate in violation of MCL 438.41. *Id*. at 553-554. We decline to address these holdings in this opinion. Instead, we vacate them and remand to the circuit court to reconsider this case on a clean slate in light of this opinion.

6

loan.  [*Soaring Pine Capital Real Estate & Debt Fund II, LLC v Park Street Group Realty Servs, LLC*, 509 Mich 875, 875-876 (2022).]

## II.  STANDARD OF REVIEW

Whether a contractual provision is unenforceable as against public policy is a question of law that we review de novo.  *Terrien v Zwit*, 467 Mich 56, 60-61; 648 NW2d 602 (2002).  We also review de novo questions of statutory interpretation.  *In re Reliability Plans of Electric Utilities for 2017–2021*, 505 Mich 97, 118; 949 NW2d 73 (2020).  "Reviewing an issue de novo means that we review the legal issue independently, without deference to the lower court."  *Id*. at 118-119.

## III.  THE ENFORCEABILITY OF USURY SAVINGS CLAUSES

We first consider whether a usury savings clause can be enforced to avoid an illegal interest rate.  We hold that a usury savings clause is ineffective if a note otherwise facially requires the borrower to pay a usurious interest rate, even if the stated interest in the note is not usurious.[9]  This holding is consistent with longstanding Michigan public policy that protects borrowers from excessive interest rates by placing the primary burden on the lender to know and comply with the law when imposing interest, fees, and charges on a loan.  However, a usury savings clause may be enforceable in circumstances where this

---

[9] While we asked the parties to address whether a usury savings clause is "void," we decline to use that terminology in this opinion to avoid confusion.  "Void" is commonly defined as " '[n]ull; ineffectual; nugatory; having no legal force or binding effect . . . ." *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 537; 872 NW2d 412 (2015), quoting *Black's Law Dictionary* (6th ed).  Our holding today is not that a usury savings clause *never* has any "legal force or binding effect," but rather that it is ineffective for certain purposes and under certain circumstances.  Moreover, we do not hold in this opinion that the entire loan agreement is rendered ineffective under these circumstances, but rather only the usury savings clause is ineffective.

7

public policy is not undermined, such as if the interest due is pushed above the legal amount because of a future contingency or event after the loan is entered.

We leave it to the circuit court on remand to reassess, as necessary, the note in this case and its effect on Soaring Pine's claims.

## A. LEGAL BACKGROUND

"[C]ourts have a duty to refuse to enforce a contract that is contrary to public policy." *Sands Appliance Servs, Inc v Wilson*, 463 Mich 231, 239; 615 NW2d 241 (2000). Thus, while the general rule is that the parties' contractual agreement should be "enforced as written," this rule does not apply if a "provision would violate law or public policy." *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d 23 (2005).

"Public policy" in this context is a legal term of art that refers to policies that are "clearly rooted in the law." *Terrien*, 467 Mich at 67. Relatedly, there must be " 'definite indications in the law of the sovereign to justify the invalidation of a contract as contrary to [public] policy.' " *Id*. at 68, quoting *Muschany v United States*, 324 US 49, 66; 65 S Ct 442; 89 L Ed 744 (1945). However, a contractual provision can violate public policy even if there is no statute or prior caselaw expressly prohibiting that contractual provision. See *People v Smith*, 502 Mich 624; 918 NW2d 718 (2018) (in which a majority of the Court agreed, as a matter of first impression, that a "bar-to-office" plea agreement violates public policy under the common law in certain circumstances); see also *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 695; 316 NW2d 710 (1982) ("The courts have . . . occasionally found sufficient legislative expression of policy to imply a cause of

action for wrongful termination even in the absence of an explicit prohibition on retaliatory discharges.").

"In identifying the boundaries of public policy," this Court looks to "the policies that . . . have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law." *Terrien*, 467 Mich at 66-67. Given its historical pedigree, there are a healthy number of Michigan appellate cases addressing usury. We properly look to these legal precedents for additional guidance in determining Michigan's public policy. *Id*. at 68, citing *Muschany*, 324 US at 66.

## B. ANALYSIS

### 1. PUBLIC POLICY REFLECTED IN MICHIGAN'S USURY PROTECTIONS

Before addressing whether usury savings clauses are enforceable, we examine the history of Michigan's usury laws. Read together, the pertinent statutes and caselaw provide a "definite indication" that the public policy behind Michigan's usury statutes is to protect borrowers from excessive interest rates imposed by lenders. Michigan's anti-usury scheme seeks to further this goal in five basic ways. First, Michigan statutes impose bright-line interest-rate ceilings on certain loans. Second, the lender has the primary burden to ensure that a loan's interest does not exceed that ceiling. Third, Michigan courts look beyond the parties' labels when determining whether an illegal interest rate has been imposed. Fourth, a borrower is entitled to the statutory remedy for usury even if the lender did not intend to

impose an illegal interest rate. Finally, Michigan statutes provide for both civil and criminal punishment of lenders who impose an illegal interest rate.[10]

### a. MICHIGAN'S GENERAL USURY STATUTES

"Usury is, generally speaking, the receiving, securing, or taking of a greater sum or value for the loan or forbearance of money, goods, or things in action than is allowed by law." *People v Lee*, 447 Mich 552, 556; 526 NW2d 882 (1994) (cleaned up). "The law of usury is not a new concept in law. Indeed, it dates back as far as Biblical times." *Id*. "America has historically been deeply committed to usury law," and "[t]he first American usury law, adopted by the Massachusetts colony in 1641, predates the U.S. Constitution by nearly 150 years." Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn L Rev 1110, 1116, 1117 (2008). "Today, most states have statutes setting interest rate limits and prohibiting usury." Cremades, *Usury and Other Defenses in U.S. Litigation Finance*, 23 Kan J L & Pub Pol'y 151, 160 (2014).[11] While there are many historical justifications

---

[10] See MCL 438.32 (barring the recovery of any interest for violations of civil usury); MCL 438.41 (punishing criminal usury with up to five years' imprisonment and/or fines of $10,000); MCL 438.42 (punishing possession of usurious loan documents with up to one year of imprisonment and/or fines of $1,000).

[11] We recognize that, notwithstanding its historical pedigree, some modern commentators have criticized usury laws as against the public interest. See, e.g., Morris, *Consumer Debt and Usury: A New Rationale for Usury*, 15 Pepp L Rev 151, 155 (1988) (noting that "usury has been uniformly criticized in law review literature as anticompetitive and amounting to the unnecessary regulation of lenders"); see also McCall, *Unprofitable Lending: Modern Credit Regulation and the Lost Theory of Usury*, 30 Cardozo L Rev 549, 551 (2008) (arguing that America's current credit system "needs reform" and noting that "[s]ome academics have advocated various solutions including complete deregulation, heightened disclosure law, higher usury rates, lower usury rates, and the use of an unconscionability standard"). Our Legislature clearly does not share the view that usury laws are, in all

for usury laws,[12] we have recognized that the primary purpose of Michigan's usury laws " 'is to protect the necessitous borrower from extortion.' " *Lee*, 447 Mich at 556-557, quoting *Wilcox v Moore*, 354 Mich 499, 504; 93 NW2d 288 (1958).[13]

Consistently with this history, Michigan, since statehood, has enacted statutes imposing a fixed cap on the interest rate lenders may charge on certain loans while providing borrowers a mechanism for enforcing this limitation. In 1838, Michigan enacted a usury statute that limited interest on a loan to 7%, while permitting an interest rate up to

---

circumstances, against the public interest, and it would be inappropriate for this Court to take a position on that issue. However, we note that the Legislature has, at minimum, a legitimate basis for believing that a fixed limitation on excessive interest rates in certain circumstances serves the public interest. See *Consumer Debt and Usury*, 15 Pepp L Rev at 152 (arguing for the benefits of usury laws, including "protecting individuals from indebtedness," controlling the money supply to prevent inflation, and "protecting society from the negative effects of enormous consumer indebtedness").

[12] See generally Visser & McIntosh, *History of Usury Prohibition: A Short Review of the Historical Critique of Usury*, 8 Acct, Bus & Fin Hist 175 (1998), available at <https://www.alastairmcintosh.com/articles/1998-Usury-Visser-McIntosh.pdf > (accessed February 22, 2023) [https://perma.cc/LFC5-CPEA]; see also *Usury Law*, 92 Minn L Rev at 1116-1122.

[13] This general purpose is also widely recognized by other jurisdictions and secondary sources. See, e.g., *Chandler v Kendrick*, 108 Fla 450, 452; 146 So 551 (1933) ("The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans."); *Adar Bays, LLC v GeneSYS ID, Inc*, 37 NY3d 320, 327-332; 179 NE3d 612 (2021) (describing the history of New York's usury laws and explaining that "the modern conception of our usury laws focuses on the protection of persons in weak bargaining positions from being taken advantage of by those in much stronger bargaining positions"); NC Gen Stat 24-2.1(g) ("It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws."); *Usury and Other Defenses*, 23 Kan J L & Pub Pol'y at 161 ("The rationale behind usury legislation is to protect borrowers from the outrageous demands often made and required by lenders.") (quotation marks and citation omitted).

10% if stipulated in writing. 1838 RS, ch 160-161, § 3. While the precise maximum interest rate has fluctuated throughout Michigan's history,[14] the generally applicable civil usury rate has consistently hovered around the level set by the 1838 statute. See MCL 438.31 (setting the current general civil usury rate at 5%, or 7% if stipulated in writing); but see MCL 438.31c (setting different civil usury rates for some types of loans); MCL 438.41 (setting the criminal usury rate at 25%).

Under the 1838 statutory scheme, a borrower could invoke usury protections to recover interest already paid and to defend against a collection action. See *Thurston v Prentiss*, 1 Mich 193, 200 (1849); *Gladwin State Bank v Dow*, 212 Mich 521, 532; 180 NW 601 (1920). In an action to recover interest already paid, a borrower was entitled to "recover back three fold the amount of the excess of such interest . . . ." 1838 RS, ch 161, § 7. When successfully invoked as a defense to a collection action, a borrower was entitled to recover their "full costs" in the action and was entitled to a reduction of any judgment against them by "three fold the amount of usurious interest . . . reserved, taken or received . . . ." 1838 RS, ch 161, § 5. Both statutory remedies were punitive, given that a borrower was entitled to a remedy beyond an obligation to pay at the maximum legal interest rate. See *Thurston*, 1 Mich at 200-201 (noting that the right to recover "threefold the amount of the excess of interest" under 1838 RS, ch 161, § 5 was "partly in the nature of a penalty"); see generally *People ex rel Drew v Washtenaw Circuit Court Judges*, 1

---

[14] See, e.g., *Fretz v Murray*, 118 Mich 302, 304; 76 NW 495 (1898) (noting an amendment of the maximum legal rate to 6%, or 10% if stipulated in writing).

Doug 434 (Mich, 1844) (repeatedly characterizing the remedy for a usury defense under 1838 RS, ch 161, § 7 as a "penalty").

In 1843, the usury statutes were amended to remove the punitive aspects of the scheme. See *Fretz*, 118 Mich at 304 (describing the statutory changes). Under the 1843 amendment, a borrower who invoked a usury defense was still obligated to pay the loan's principal and interest up to the maximum rate. *Id*., quoting 1843 PA 47 (" 'The [lender] shall have judgment for the principal and legal interest only.' "). A borrower was no longer entitled to their full costs, nor were they entitled to a reduction of the judgment against them by threefold the amount of usurious interest. *Id*. Moreover, the provision permitting a borrower to recover usurious interest already paid was removed entirely. *Id*., citing 1843 PA 47; see *Smith v Stoddard*, 10 Mich 148, 152 (1862) (holding that "if parties completely perform [usurious contracts] they are remediless").

The limited 1843 remedial scheme was replaced in 1891 with the enactment of MCL 438.51 to MCL 438.53. See *Fretz*, 118 Mich at 303-305; *Mich Mobile Homeowners Ass'n v Bank of Commonwealth*, 56 Mich App 206, 212-218; 223 NW2d 725 (1974). The new enforcement provision provided:

> No bond, bill, note, contract or assurance, made or given for or upon a consideration or contract, whereby or whereon a greater rate of interest has been, directly or indirectly, reserved, taken or received, than is allowed by law, shall be thereby rendered void; but *in any action brought by any person on such usurious contract or assurance . . . the defendant shall not be compelled to pay any interest thereon*. [MCL 438.52, as enacted by 1891 PA 156, § 2 (emphasis added).]

The 1891 usury statutes provided a middle-ground remedy for borrowers. Like the 1843 usury statute, the 1891 statute did not permit a borrower to recover usurious interest already

13

paid. See, e.g., *Gladwin*, 212 Mich at 531; *Wright v First Nat'l Bank of Monroe*, 297 Mich 315, 328; 297 NW 505 (1941). However, a borrower who successfully invoked usury as a defense was no longer required to pay the maximum legal interest rate. Instead, such a borrower did not have to pay *any* interest on the loan. MCL 438.52, as enacted by 1891 PA 156, § 2. Moreover, under some circumstances a lender who violated the 1891 usury statutes could be subject to criminal prosecution or another action by an appropriate authority. See *People v Coleman*, 337 Mich 247, 248; 59 NW2d 276 (1953) (affirming a criminal conviction for an unlicensed lender who engaged in a "small loan business" and charged a usurious rate under former MCL 438.51); *Attorney General v Contract Purchase Corp*, 327 Mich 636; 42 NW2d 768 (1950) (addressing a quo warranto action brought by the Attorney General that was based, in part, on an alleged violation of former MCL 438.51). Thus, the 1891 usury statutes eschewed the 1843 statute's nonpunitive approach in favor of punitive remedies that went beyond requiring repayment at the legal rate. See, e.g., *Vandervelde v Wilson*, 176 Mich 185, 190; 142 NW 553 (1913) (characterizing the 1891 usury statutes as "penal in character").

Michigan's usury statutes from 1967 through today embody the same basic approach as the 1891 usury statutes. There are currently two primary mechanisms for policing usurious interest rates: a civil usury prohibition, see MCL 438.31 to MCL 438.32, and a criminal usury prohibition, see MCL 438.41 and MCL 438.42.[15] The current civil

---

[15] MCL 438.51 to MCL 438.53 were repealed and replaced by the civil usury statutes in 1967. See 1966 PA 326, effective March 10, 1967; see *Mich Mobile Homeowners*, 56 Mich App at 212-215 (discussing this statutory history). The current criminal usury statutes were adopted two years after the passage of 1966 PA 326. See 1968 PA 259, effective November 15, 1968. While MCL 438.51 had, under certain circumstances, been

usury enforcement provision provides that a "seller or lender" who imposes a usurious interest rate "is barred from the recovery of any interest, any official fees, delinquency or collection charge, attorney fees or court costs and the borrower or buyer shall be entitled to recover his attorney fees and court costs from the seller, lender or assigns." MCL 438.32.[16] The criminal usury statutes provide that one who "knowingly charges, takes or receives" an interest rate above 25% is guilty of a crime, MCL 438.41, as is one who possesses "usurious loan records," MCL 438.42. Consistently with historical practice, the current usury statutes generally apply to the party seeking to impose or collect the usurious

_____

enforced through criminal proceedings, see *Coleman*, 337 Mich at 248, MCL 438.41 and MCL 438.42 are seemingly the first general Michigan usury statutes to authorize criminal penalties. Michigan is among a minority of jurisdictions that make usury a crime. See Bender, *Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive Commercial and Consumer Interest Rates under the Unconscionability Standard*, 31 Hous L Rev 721, 789 (1994) (noting that, as of 1994, "only a dozen or so states provide[d] criminal penalties" for usury); see also Thomson Reuters, *Allowable Fees on Commercial Loans*, 50 State Statutory Surveys: Financial Services Loan Funding (October 2022) (providing a 50-state survey of limitations on interest rates for commercial loans, including criminal statutes).

[16] Since the enactment of the current general civil usury statutes in 1967, the Legislature has enacted statutes providing that, for certain types of loans, the criminal usury rate of 25% is the only applicable usury rate. See MCL 438.61(3); MCL 450.4212. It is not entirely clear what relationship these statutes have to the civil usury remedy provided in MCL 438.32, and there is a dearth of binding caselaw addressing these statutes. But see *Ross v Peyerk*, unpublished per curiam opinion of the Court of Appeals, issued May 26, 2022 (Docket No. 357597) (holding that a lender subject to MCL 438.61(3) who charged an interest rate exceeding 25% was precluded under MCL 438.32 from collecting any interest on the loan). While Park Street invoked MCL 438.61(3) and MCL 450.4212 in its affirmative defenses, it did so in the context of arguing that Soaring Pine committed a crime such that its claim is barred by the wrongful-conduct rule; Park Street has not argued that it is entitled to a remedy under MCL 438.32. Accordingly, this issue is not implicated in this case.

interest—i.e., the lender.[17]  Moreover, like the 1838 and 1891 usury statutes, the current usury statutes punish lenders for usury and provide a remedy for borrowers beyond reversion to the maximum legal rate.

### b. PUBLIC POLICY

This statutory history reflects several interconnected and clearly established public policies regarding usury.  Michigan's usury statutes have always placed the burden on the lender to charge a lawful interest rate and provided the borrower a remedy if the lender failed to do so.  By contrast, a borrower has no obligation—statutory or otherwise—to ensure the agreed-upon interest rate is not usurious.  See, e.g., *Union Guardian Trust Co v Crawford*, 270 Mich 207, 213; 258 NW 248 (1935) (holding that a borrower who provided the lender a note containing a usurious interest rate was not estopped from raising usury as a defense).  So long as a borrower raises usury as a defense against a lender's collection action, the borrower is entitled to the appropriate statutory remedy.[18]

---

[17] We recognize that MCL 438.42 criminalizes possession of usurious loan records generally and does not explicitly limit its scope to *lenders* who possess such records. However, we are unaware of any other authority or historical precedent for punishing a borrower, under MCL 438.42 or otherwise, for their participation in a usurious transaction. Even assuming that a borrower could be held criminally responsible for possession of usurious loan records under MCL 438.42, this does not undermine the clear public policy generally reflected in Michigan law of imposing the burden primarily on the lender to ensure that the applicable interest rate is not usurious.

[18] While never explicitly addressed by this Court or a binding Court of Appeals decision, it is generally accepted that "[t]he defense of usury is an affirmative defense which is waived if not raised" in a responsive pleading.  *Shaw Investment Co v Rollert*, 159 Mich App 575, 580; 407 NW2d 40 (1987); see also *Campbell v St John Hosp*, 434 Mich 608, 616 & n 5; 455 NW2d 695 (1990) (citing *Shaw* as an example of caselaw recognizing an affirmative defense not expressly listed in the court rules).

16

The harm the Legislature is seeking to remedy through usury laws is not excessive interest in the abstract, but rather the imposition of such rates *by lenders* to the detriment of borrowers. See *Wm S & John H Thomas v Union Trust Co*, 251 Mich 279, 282; 231 NW 619 (1930) ("The law regards the borrower as [at the mercy of the lender], and, so, the injury inflicted, and the relief afforded, as personal to the individual wronged.") (quotation marks and citation omitted); *Mich Mobile Homeowners*, 56 Mich App at 215 (noting that in Michigan's usury statutes, "the focus is upon barring recovery to the lender and penalizing the lender who attempts to enforce a usurious contract"). This reflects a legislative judgment that, at least as a general matter, there is "such an inequality in the relation of the lender and borrower that the borrower's necessities deprived him of freedom in contracting and placed him at the mercy of the lender." *Union Trust Co*, 251 Mich at 282 (quotation marks and citation omitted); see also *Swindell v Fed Nat'l Mtg Ass'n*, 330 NC 153, 160; 409 SE2d 892 (1991) (explaining that North Carolina's usury statutes "relieve[] the borrower of the necessity for expertise and vigilance regarding the legality of rates he must pay. That onus is placed instead on the lender, whose business it is to lend money for profit and who is thus in a better position than the borrower to know the law").[19]

---

[19] Cf. Porter, *The Field Between Lions and Zebras . . . Evening the Playing Field Between Lenders and Borrowers: Conflicts of Interest and Legal Obligations in the Residential Mortgage Transaction*, 30 Quinnipiac L Rev 623, 650 (2012) (arguing that "[b]ecause borrowers are in an inferior bargaining position due to knowledge asymmetry that favors lenders, borrowers are susceptible to lenders who abuse their power and steer borrowers to certain mortgage loans or terms"); *Consumer Debt and Usury*, 15 Pepp L Rev at 172 (arguing that "[a]n informational failure may cause borrowers to misestimate the true cost of credit").

Consistently with the assumption that borrowers are "at the mercy of the lender" and therefore in need of protection, this Court has held that lenders cannot avoid civil remedies for usury through creative contracting or by claiming ignorance. In determining whether interest is usurious, "[i]t is elementary that . . . we are not bound by the form of the transaction, and that, notwithstanding how it may be characterized by the parties in their written agreement, its real nature must be determined from all of the facts and circumstances." *Abeloff v Ohio Fin Co*, 313 Mich 568, 577; 21 NW2d 856 (1946); see also *Wilcox*, 354 Mich at 504 ("[A] court must look squarely at the real nature of the transaction, thus avoiding, so far as lies within its power, the betrayal of justice by the cloak of words, the contrivances of form . . . . We are interested not in form or color but in nature and substance."). Moreover, at least in the civil context, a lender's mistaken belief that interest is not usurious does not preclude the statutory remedy for the borrower. See, e.g., *Houghteling v Gogebic Lumber Co*, 165 Mich 498, 503; 131 NW 109 (1911); *Union Guardian*, 270 Mich at 213.[20]

---

[20] There appears to be no binding appellate authority before this case addressing the standard for determining whether a lender committed a crime by "knowingly" seeking a usurious interest rate in violation of MCL 438.41. But see *Coleman*, 337 Mich at 248, 250 (holding that to be convicted for engaging in a "small loan business" while being unlicensed and charging a usurious rate under former MCL 438.51, the lender need not have intended that its loan "constitute a criminal offense"); *Wilkerson v Seder*, 81 Mich App 726, 728-729; 265 NW2d 807 (1978) (stating in dicta that there was no question of fact that the lender acted knowingly when the note was not facially usurious and there was no evidence as to the lender's knowledge of the interest rate); *Scalici v Bank One, NA*, unpublished per curiam opinion of the Court of Appeals, issued September 20, 2005 (Docket Nos. 254632, 254633, and 254634), p 5 (holding that "according to its plain language, a person is guilty of violating MCL 438.41 when they charge, take or receive money or other property as interest on a loan, while knowing that the interest charged, taken or received exceeded a simple interest rate of 25% per year"). As discussed in more detail later, we do not address that issue in this opinion. However, as recognized by the

Finally, it is important to emphasize that Michigan's usury statutes since 1891 have punished lenders for usury and have not simply reverted the amount a borrower owed to the legal limit.[21]  Under the 1891 civil usury statute, a lender could not collect *any* interest on a usurious loan and could be charged criminally.  See former MCL 438.52; *Coleman*, 337 Mich at 248.  Similarly, the current civil usury statute precludes collection of any interest on a usurious loan and further requires a lender to pay the borrower's costs and attorney fees.  MCL 438.32.  Moreover, under the current scheme, a lender may still be punished criminally for usury.  MCL 438.41; MCL 438.42.  Thus, the statutory scheme indicates a legislative intent beyond merely ensuring that the interest actually paid in a particular case is not usurious.  Rather, the Legislature is seeking to punish lenders who engage in usurious conduct and prevent future attempts to collect excessive interest.  See *Mich Mobile Homeowners*, 56 Mich App at 215 (noting that Michigan's current usury statutes "penaliz[e] the lender who attempts to enforce a usurious contract"); *Washburn v Michailoff*, 240 Mich App 669, 674; 613 NW2d 405 (2000) (same).

## c. SOARING PINE'S ARGUMENTS

Soaring Pine argues that the public policies underlying Michigan's usury statutes should only apply to the subset of borrowers that need protection from exploitation and not

---

Court of Appeals, to invoke the wrongful-conduct rule in this case, Park Street must demonstrate on remand that Soaring Pine committed a criminal act by "knowingly" charging a usurious rate.

[21] As discussed earlier, Michigan's usury statutes in effect from 1838 through 1843 also imposed a punitive remedy for usury.  See 1838 RS, ch 160-161, §§ 5, 7; *Thurston*, 1 Mich at 201; *Washtenaw Circuit Court Judges*, 1 Doug at 447.

to sophisticated commercial borrowers like Park Street. Soaring Pine also argues that Michigan's usury statutes are so contradictory and unclear that "[i]t is impossible to discern any over-arching public policy underlying the state's usury statutes." We disagree on both points.

Soaring Pine and amicus, the Business Law Section of the State Bar of Michigan (Amicus BLS), argue that the primary purpose behind Michigan's usury laws—"to protect the *necessitous* borrowers from extortion," *Lee*, 447 Mich at 556-557 (quotation marks and citation omitted; emphasis added)—does not apply to business entities and sophisticated borrowers involved in high-value commercial transactions. Admittedly, the general purpose of protecting vulnerable borrowers from exploitation is arguably not furthered if the borrower is of comparable bargaining power with the lender. Relatedly, there is a reasonable equitable argument that knowledgeable borrowers should not obtain a windfall and be permitted to skirt the financial obligations they knowingly agreed to by belatedly arguing that the agreement was usurious.[22]

However, when defining the contours of Michigan's public policy, "the focus of the judiciary must ultimately be upon the policies that, *in fact*, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law." *Terrien*, 467 Mich at 66-67 (emphasis added). The

---

[22] We speak here only in the abstract and, given our conclusion that such considerations are irrelevant, do not address the parties' arguments as to whether Park Street is a "sophisticated" borrower such that the usury savings clause should be enforceable against it. Relatedly, we do not address Soaring Pine's allegations that Park Street committed fraud in procuring the loan; those allegations are best addressed by the circuit court in the first instance.

categorical distinction between "sophisticated" commercial business entities and other borrowers is not clearly reflected in Michigan's usury statutes or the accompanying caselaw.[23] Conceivably, some of the current statutory exemptions from certain usury statutes could be viewed as rough proxies for these types of borrowers. See, e.g., MCL 438.31c(11) (providing that "[t]he parties to a note, bond, or other indebtedness of $100,000.00 or more, the bona fide primary security for which is a lien against real property other than a single family residence, or the parties to a land contract of such amount and nature, may agree in writing for the payment of any rate of interest");[24] MCL 450.1275 (allowing "[a] domestic or foreign corporation" to agree in writing to an interest rate "in excess of the legal rate"). But the legislative intent on this point is too muddled for us to draw a clear line between "sophisticated" commercial borrowers and other borrowers.

For example, MCL 438.61(3) prevents "business entit[ies]" from contracting with unregulated lenders for rates above the criminal usury statute—regardless of sophistication. Similarly, MCL 450.4212 provides that LLCs cannot agree to interest rates

---

[23] Soaring Pine cites *Union Trust Co*, 251 Mich at 283-284, to support the argument that the public policy behind usury provisions does not apply with equal force to nonnatural legal entities. However, *Union Trust* addressed a different legal question than the question we are addressing here. That case involved a constitutional challenge to a Michigan statute that "den[ied] to all corporations the defense of usury . . . ." *Id*. at 282. The Court held that the Legislature's decision to exclude corporations from the defense of usury was "reasonable" and therefore withstood constitutional challenge. *Id*. at 284. The Court's discussion of whether the Legislature had the constitutional authority to bar a usury defense in this circumstance does not assist this Court in determining Michigan's public policy where usury protections do apply, such as loans to LLCs. See MCL 450.4212.

[24] We do not address Soaring Pine's argument that the loan in this case is not subject to any usury protections pursuant to MCL 438.31c(11).

above the criminal usury rate—regardless of sophistication. These statutes belie Soaring

Pine's contention that the public policies underlying Michigan's usury statutes do not apply

to sophisticated borrowers. In determining Michigan's public policy, it would be

inappropriate to differentiate between borrowers that the Legislature has determined are

uniformly entitled to usury protections. Cf. *People v Betts*, 507 Mich 527, 565; 968 NW2d

497 (2021) ("We decline to encroach on the Legislature's plenary authority to create law

or on its role in shaping and articulating policy . . . .").[25]

Moreover, while some scholars have advocated replacing categorical interest-rate

prohibitions with a case-by-case inquiry into whether the interest assessed is

"unconscionable,"[26] the Michigan Legislature has consistently maintained a bright-line

standard for determining when interest is excessive while providing exemptions from that

---

[25] From a practical standpoint, we also question what the appropriate standard would be for distinguishing between borrowers in the manner suggested by Soaring Pine and Amicus BLS. For example, how should a court determine whether a particular party is "sophisticated"? What level of "sophistication" is sufficient to justify enforcing a usury savings clause? We decline to engage in such line-drawing when the Legislature has already determined that a particular borrower is entitled to usury protections.

[26] See *Rate Regulation*, 31 Hous L Rev at 728-745 (advocating for policing excessive interest rates through a "variable fairness standard" of unconscionability on a case-by-case basis rather than through the "fixed fairness standard" of usury laws); see also Note, *An Ounce of Discretion for a Pound of Flesh: A Suggested Reform for Usury Laws*, 65 Yale L J 105, 108 (1955) (arguing that "[a]doption of a statute implementing the doctrine of unconscionability would eliminate the restrictive effects of existing usury laws yet provide adequate protection for borrowers not covered by consumer loan legislation"). But see *Consumer Debt and Usury*, 15 Pepp L Rev at 152, 153 n 12, 173-174 (arguing that usury laws not only protect vulnerable borrowers but also serve society's interest in preventing inflation by controlling the supply of money and that usury protections are preferable to the unconscionability doctrine because the latter doctrine is less objective and more expensive for a borrower to enforce).

standard in certain defined circumstances.[27] This reflects a policy determination that fixed

usury standards generally best serve the public interest but that, in some contexts, other

considerations outweigh the historical justification for such protections. The Legislature

clearly has the authority to make that judgment, subject only to constitutional limitations.

See *Union Trust Co*, 251 Mich at 283-284 (rejecting a constitutional challenge to a statute

excluding corporations from usury protections). However, these exceptions to usury laws

are not dispositive as to the public policy reflected by usury laws where such protections

*do* apply.

Soaring Pine also argues more broadly that we cannot derive any coherent public

policy behind Michigan's usury laws given the proliferation of statutory exemptions to

usury and the disparate treatment of different kinds of loans. We do not disagree that how

Michigan usury laws apply to a particular situation is not always clear and that there is

disparity among the treatment of certain loans that is in tension with the public policies

identified earlier.[28] In particular, we note that according to our Attorney General, payday

---

[27] While the precise maximum rate varies based on the type of loan, any rate provided is a fixed, definite number as to the applicable class of loans. See, e.g., MCL 438.31 (setting the general civil usury interest rate at 5%, or 7% if stipulated in writing); MCL 438.31c (setting an 11% civil usury rate for certain types of loans); MCL 438.41 (setting the criminal usury rate at 25%).

[28] Cf. *Usury Law*, 92 Minn L Rev at 1138-1149 (arguing generally that American usury laws have become "more lax," "more polarized," and "more misleading"); see also Martin, *Financing Litigation On-Line: Usury and Other Obstacles*, 1 DePaul Bus & Com L J 85, 90 (2002) (noting that most states currently have exemptions for usury statutes in certain situations and that "[c]ritics have argued that the variety of usury laws across and within individuals states makes no logical or economic sense and is merely the result of dedicated interest group lobbying").

lenders may legally impose an effective interest rate up to 391% APR.[29]  Permitting

personal loans with such astronomical and predatory interest rates seems contrary to the

general purpose of protecting necessitous borrowers reflected in Michigan's usury laws.

See *Usury Law*, 92 Minn L Rev at 1112 & n 4 (noting empirical studies that "paint a

troubling picture of payday lenders systematically disregarding state consumer-protection

laws and intentionally manipulating borrowers into long-term debt traps").[30]

---

[29] See Michigan Department of Attorney General, *Payday Loans: Know Your Rights* <https://www.michigan.gov/ag/consumer-protection/consumer-alerts/consumer-alerts/credit/payday-loans> (accessed February 23, 2023) [https://perma.cc/YTF3-83E2]; see also *Usury Law*, 92 Minn L Rev at 1151 n 178 (discussing payday loans generally and identifying Michigan as one of 24 states in which there is "a disparity of over 350 percentage points between the actual annual percentage rate of their most expensive permitted payday loan and the number featured in the [usury] statute").  As explained by our Attorney General:

> A payday loan is a short-term, high-cost transaction where a customer borrows money for a service fee.  The customer writes a personal check to the lender for the amount borrowed plus the service fee.  The lender gives the customer the loaned amount and holds the customer's check (usually until the customer's next payday) before presenting the check to the customer's bank for payment.  You may see these advertised as a payday loan, cash advance, or check advance loan. [Michigan Department of Attorney General, *Payday Loans: Know Your Rights* <https://www.michigan.gov/ag/consumer-protection/consumer-alerts/consumer-alerts/credit/payday-loans> (accessed February 23, 2023) [https://perma.cc/YTF3-83E2].].

[30] As explained by our Attorney General:

> [P]ayday loans can create a trap for a cash-strapped customer who cannot repay the loan and takes out a second payday loan to pay off the first.  It's a slippery slope.  When the customer cannot pay back the second payday loan, the customer takes out a third, and so on and so on.  This rollover pattern racks up service fees and puts the customer in perpetual debt. [Michigan Department of Attorney General, *Payday Loans: Know Your Rights* <https://www.michigan.gov/ag/consumer-protection/consumer-

However, we disagree with Soaring Pine that "[i]t is impossible to discern any over-arching public policy underlying the state's usury statutes."  Regardless of any gaps or uncertainty in the statutory scheme, it is clear that—where usury protections do apply—the public policy of this state is to protect borrowers from unlawful interest rates by placing the primary burden on lenders to ensure that loans are not usurious.  It would be a derogation of duty for this Court to ignore that public policy simply because it is arguably imperfectly applied or arguably should be extended to additional circumstances.  See *Sands*, 463 Mich at 239 ("[C]ourts have a duty to refuse to enforce a contract that is contrary to public policy.").[31]

alerts/consumer-alerts/credit/payday-loans> (accessed February 23, 2023) [https://perma.cc/YTF3-83E2].].

For a partial account of the criticisms of Michigan's payday lending laws, the Legislature's consideration of reform, and recommendations for addressing the issue, see generally Brown, *Has Michigan Legalized Usury?  A New Law Gives Payday Lending the Stamp of Approval*, 85 Mich B J 24 (2006); Rigsby, *Regulating the Payday Lending Industry: Has Michigan Made a Step in the Right Direction?*, 11 T M Cooley J Prac & Clinical L 417 (2009).

[31] Along similar lines, we recognize that—even where usury protections do apply—there are limitations on a borrower's ability to recover from a lender for usurious conduct.  As discussed earlier, since 1843, usury has generally been recognized to only provide a *defense* to a lender's collection action; a borrower generally does not have the right to recover interest already paid or to otherwise bring a standalone cause of action against a lender for usury.  See *Smith*, 10 Mich at 152; *Gladwin*, 212 Mich at 531; *Wright*, 297 Mich at 328; *Mich Mobile Homeowners*, 56 Mich App at 214-215; *Wilkerson*, 81 Mich App at 728 (holding that a borrower may not bring a civil cause of action based on a violation of the criminal usury statute).  However, like the statutory exemptions to usury discussed earlier, these limitations do not undermine Michigan's clear public policy when a borrower properly invokes a usury defense.  Moreover, any limitation on a borrower's ability to invoke a civil usury defense and to recover interest already paid in a civil action does not relieve the lender of possible criminal punishment for usury.  See MCL 438.41 (making it

## 2. USURY SAVINGS CLAUSES

The question then is whether usury savings clauses are contrary to these public policies such that a court cannot enforce them. *Sands*, 463 Mich at 239.[32] Stated broadly, we hold that usury savings clauses are unenforceable when they nullify the statutory remedies for usury, thereby relieving lenders of their duty to ensure that loans are not usurious.

Generally speaking, "[a] usury savings clause is a provision in a loan agreement that attempts to negate any other provisions in the agreement that might result in the extraction of an illegal rate of interest." *Jersey Palm-Gross, Inc v Paper*, 658 So 2d 531, 534 (Fla, 1995). Such a clause will often provide that should the interest on the loan be found usurious, the contract will be reformed and the borrower will be required to pay only the maximum legal rate. Carter, *The Efficacy and Risk of Usury Savings Clauses*, 2 Transactional Law 3, 3 (2012). As one secondary source explains:

> To avoid the consequences of a usurious loan, transactional lawyers occasionally include a usury savings clause in their loan agreements. When triggered, such a clause reduces the interest charged to the maximum permissible amount. Such a clause can be useful because it is not always clear which fees and expenses (*e.g.*, late charges, commitment fees, points, or origination fees) the law regards as equivalent to interest. In other words,

---

a crime for a lender to "knowingly charge[], take[] or receive[]" an interest rate above 25%).

[32] Before the Court of Appeals decision here, there was no binding Michigan appellate authority addressing this issue. In its brief, Soaring Pine cites two nonbinding cases upholding the effectiveness of a usury savings clause under Michigan law. See *Karel v JRCK Corp*, unpublished per curiam opinion of the Court of Appeals, issued May 10, 2012 (Docket No. 304415); *In re Skymark Props II, LLC*, 597 BR 363, 390 (Bankr ED Mich, 2019).

> it is not always clear when the loan agreement charges usurious interest and when it does not. [*Id*.]

Other states have taken varying approaches to usury savings clauses, with many states recognizing that such clauses are enforceable only in some circumstances, see, e.g., *Jersey Palm-Gross*, 658 So 2d 531; *First State Bank v Dorst*, 843 SW2d 790 (Tex App, 1992), and others seemingly adopting a categorical rule that they are unenforceable, see, e.g., *NV One, LLC v Potomac Realty Capital, LLC*, 84 A3d 800 (RI, 2014); *Swindell*, 330 NC 153.

We agree with those jurisdictions that hold that it is contrary to public policy to enforce a usury savings clause if the interest provided in the loan agreement is otherwise facially usurious at the time of contracting. See, e.g., *Dorst*, 843 SW2d at 793 ("[A] creditor may not specifically contract for a 30% interest rate [which is above the legal limit] and then avoid the imposition of usury penalties by relying on a savings clause that declares an intention not to collect usurious interest."). To illustrate why, imagine an unscrupulous lender who is seeking to maximize their rate of return as much as possible, usury laws be damned. This lender would impose the highest interest rate the borrower will agree to and include a usury savings clause in the loan agreement. Either the borrower repays the lender at the illegal rate (and likely is precluded from recovering those payments, see, e.g., *Wright*, 297 Mich at 328) or the borrower declines to pay and raises a usury defense to the lender's collection action. In the latter scenario, the lender can point to the usury savings clause and, if the clause is given effect, recover the maximum interest rate legally permitted. There would be little downside for a lender who attempts to impose an unlawful interest rate; they can take advantage of an illegal interest rate until a borrower objects, and if the borrower does object, the lender can avoid the statutory penalties and recover the maximum

amount legally permitted. See *NV One*, 84 A3d at 810 (arguing that if usury savings clauses were enforceable, "lenders could charge excessive rates without recourse" and that lenders would be incentivized "to attempt to charge excessive interest rates because, at worst, the lender could invoke the savings clause and the interest rate would simply be reduced to the highest acceptable rate without any penalty to the lender").

In holding that usury savings clauses are generally enforceable, the Court of Appeals acknowledged that "[i]t is certainly possible that unscrupulous lenders could take advantage of borrowers by including within a contract a usury-savings clause while still seeking to collect unlawful interest, with the hope (and perhaps expectation) that the unlawful rates will be paid by the borrower and not be challenged in court." *Soaring Pine Capital*, 337 Mich App at 546 n 6. But the Court reasoned that "under the common law of contracts and the statute as written, these clauses are permissible." *Id*. In so reasoning, the Court of Appeals failed to recognize that the usury statutes need not explicitly prohibit usury savings clauses for such clauses to violate public policy. See *Smith*, 502 Mich 624; *Suchodolski*, 412 Mich at 695. The Court of Appeals also failed to appreciate that the general rule of enforcing contracts as written must yield to the public policy reflected by the usury statutes and that the public policy of protecting borrowers reflected in these statutes would be significantly undermined if usury savings clauses were enforceable in all circumstances.

Additionally, in holding that the note in this case was not facially usurious, the Court of Appeals seemed to find it significant that the note had "a *stated* interest rate at or below the statutory maximum . . . ." *Soaring Pine Capital*, 337 Mich App at 544 (emphasis added); see also *id*. (noting that the mortgage note here "plainly states a 20% rate and an

28

intention not to charge or collect a rate above that allowed by law"). However, as the Court of Appeals itself recognized in holding that Soaring Pine violated the criminal usury statute, a court must "look[] beyond the simple interest rate per annum stated in the contract to determine the *actual* interest rate that plaintiff was seeking to receive from defendants." *Id*. at 549; see also *Abeloff*, 313 Mich at 577; *Wilcox*, 354 Mich at 504. There is good reason for this approach; it would vitiate the usury laws if courts were to blindly accept the stated interest rate in a note, allowing a lender to smuggle in a usurious rate through fees, charges, and the like. The obligation to look beyond the parties' labels in determining whether a note is usurious is well established in Michigan law and is consistent with the public policy of protecting borrowers reflected in the usury statutes. We see no reason to adopt a different approach when determining whether a note is facially usurious such that a usury savings clause is unenforceable.

We recognize that it might not always be clear to a lender acting in good faith whether a particular fee or charge will be considered interest. But applying a usury savings clause to facially usurious loans effectively nullifies the statutory incentive for lenders to even *try* to ensure that the loans are not usurious: just insert a usury savings clause and the lender need not concern itself about whether the interest is usurious. Like all businesses (and human beings in general), lenders respond to incentives. It is common sense that a lender's goal is generally to maximize profit, and one way to do that is to minimize the costs associated with lending. Lenders employ usury savings clauses for exactly this purpose. See *Efficacy and Risk of Usury Savings Clauses*, 2 Transactional Law at 3. But

29

without a financial disincentive, lenders are less likely to take seriously their obligations to ensure that they are not imposing usurious interest rates.[33]

Even assuming that, notwithstanding this lack of incentive, lenders try in good faith to ensure that the effective interest rate in a note does not exceed the legal interest rate, the public-policy problems persist. As described in detail earlier, Michigan law puts the primary burden on the lender to comply with usury laws when charging interest and provides the borrower a punitive remedy beyond reversion to the legal rate for any violation. And, at least in the civil context, lenders are presumed to know the legal effect of the terms they include in a loan agreement. Thus, lenders have always borne the brunt of any legal uncertainty. This framework is premised on the assumptions that lenders are better equipped to ensure that interest is not excessive and that borrowers are "at the mercy of the lender." *Union Trust Co*, 251 Mich at 282 (quotation marks and citation omitted).

Enforcing a usury savings clause for facially usurious loans—even when a lender makes a good-faith mistake of law—entirely relieves a lender of that burden and shifts it almost entirely to the borrower. See *NV One*, 84 A3d at 810, quoting *Swindell*, 330 NC at 160. Even assuming that a borrower timely stops payment on the loan, identifies that the loan might charge a usurious rate, and then raises usury as a defense, the best remedy the borrower could obtain is a judgment requiring them to repay at the maximum legal rate, which is what the loan agreement should have provided anyway. Moreover, the borrower

---

[33] See Galbiati & Vertova, *How Laws Affect Behavior: Obligations, Incentives and Cooperative Behavior*, 38 Int'l Rev L & Econ 48, 54 (2014) (conducting a study and finding that while people will cooperate with an obligation without an incentive, "the effects of obligations on [compliance] are much stronger when they are supported by incentives").

would likely be required to pay their own legal fees in defending the action, contrary to the legislative intent evidenced by MCL 438.32 (requiring a lender to pay a borrower's attorney fees if the lender violates the civil usury statute).[34] This result would be inconsistent with Michigan's usury statutes, which punish lenders and provide relief for borrowers if a loan is usurious.[35]

As highlighted by Amicus BLS, lenders certainly incur costs in complying with Michigan usury laws, and these costs may limit Michigan borrowers' access to loans that would otherwise exist in an unregulated or less-regulated market.[36] However, this possibility is an inevitable result of any regulatory regime, including the widespread practice in the United States of capping interest rates for certain loans. The Legislature has long made a policy judgment regarding how best to balance the availability of loans against

[34] In Michigan, a prevailing party may not recover attorney fees unless a court rule or statute expressly authorizes such an award. *Haliw v Sterling Hts*, 471 Mich 700, 706-707; 691 NW2d 753 (2005). Through MCL 438.32, the Legislature has authorized the recovery of attorney fees for violations of the civil usury statute. But enforcement of usury savings clauses would allow lenders who have made loans on facially usurious terms to avoid that sanction. That result cannot comport with legislative intent.

[35] These clauses pose an especially pernicious risk where, as here, they also act as a de facto acceleration clause—meaning that once the usurious rate is discovered, the entire loan (principal and maximum allowed interest) becomes due immediately. Such a provision flips the statutory scheme on its head, because a borrower who raises the usurious nature of the note would be punished for doing so while the lender would benefit by having a right to immediately recover the full amount due on the loan at the maximum allowable interest rate.

[36] See *An Ounce of Discretion*, 65 Yale L J at 107 (arguing that "the added risk of incurring usury penalties raises the cost of the loan to the borrower" and that "the reluctance of the leading credit institutions to undertake both types of risk considerably limits the available sources of such credit"); *Consumer Debt and Usury*, 15 Pepp L Rev at 171 (noting that "[u]sury affects lender behavior by diminishing the amount of credit available").

31

the protection of borrowers. Indeed, as discussed earlier, the Legislature currently provides different maximum interest rates for certain types of loans and has provided exemptions from certain usury statutes when it concludes that such protections are unwarranted. We are bound to respect those choices. A lender's interest in mitigating the risk and uncertainty inherent in legally providing a loan in Michigan must give way to the public policy of protecting borrowers from illegal interest rates.

All that said, we do not suggest that enforcing a usury savings clause violates public policy in every circumstance. We agree with the Court of Appeals that "there are legitimate purposes of a usury-savings clause" and, in particular, recognize that such clauses may be enforceable " 'where the transaction is not clearly usurious at the outset but only becomes usurious upon the happening of a future contingency . . . .' " *Soaring Pine Capital*, 337 Mich App at 545, quoting *Jersey Palm-Gross*, 658 So 2d at 535.[37] At least under some circumstances, when the interest due later becomes usurious because of an event outside the control of the parties, it would not be inconsistent with public policy to permit the

_____

[37] The Florida case quoted by the Court of Appeals also suggested that a usury savings clause is legitimate and may be considered if " 'the actual interest charged is close to the legal rate . . . .' " *Soaring Pine Capital*, 337 Mich App at 545, quoting *Jersey Palm-Gross*, 658 So 2d at 535. In the context of the enforceability of a usury savings clause, we decline to adopt this "close to the legal rate" rule. Usury is a binary state; either a loan is usurious or it is not. See 44B Am Jur 2d, Interest and Usury (February 2023 update), § 113 ("Once the legal rate [for usury] is exceeded, the extent of the advantage, or the amount of the surplus, in excess of legal interest is wholly inconsequential."). The Legislature has drawn the line for what interest rate is permitted and has placed the primary burden on the lender to comply with this directive. We decline to redraw this line in the context of usury savings clauses. Accordingly, a usury savings clause is unenforceable as to a facially usurious note even if the illegal interest rate is "close" to the legal rate. We do not address to what extent the closeness of the actual rate to the legal rate is relevant to whether a lender acted "knowingly" under MCL 438.41.

32

lender to recover at the maximum legal rate. In that situation, the statutory penalties for usury would often, if not always, not serve any deterrent purpose. Moreover, declining to give effect to a usury savings clause in such circumstances would remove the incentive for lenders to explain in the loan agreement that the interest due will not exceed the legal limit regardless of any later event. Given that there is no allegation that the interest rate in this case was pushed over the legal limit by an outside event, we need not describe with precision when a usury savings clause is enforceable in such situations.

A few final points are worth emphasizing. While this case involves the criminal usury statute, our holding today also applies when determining whether a note is usurious for the purpose of the civil usury statutes. Additionally, our holding is limited to whether a note imposes a usurious interest rate notwithstanding a usury savings clause. We do not address whether the loan in this case is subject to any usury protections, nor do we address whether the note in this case is facially usurious. Finally, we do not address the effect, if any, of a usury savings clause when determining whether Soaring Pine (or any future lender) has violated the criminal usury statute by "knowingly charg[ing], tak[ing] or receiv[ing]" a usurious rate. MCL 438.41. These are issues that are best addressed, as necessary, in the first instance by the circuit court in light of this opinion.

## IV. CRIMINAL LIABILITY FOR SEEKING A USURIOUS INTEREST RATE IN A CIVIL ACTION

While both the circuit court and the Court of Appeals held that the note here was not facially usurious, they concluded that Soaring Pine violated the criminal usury statute

by seeking to recover a usurious interest rate in this action.[38] We hold that seeking to collect a usurious interest rate in a civil action, standing alone, does not violate the criminal usury statute. This holding is consistent with both (1) the language of the criminal usury statute read in light of the interpretive principle that conduct which would result in a criminal conviction must be clearly stated and (2) the public policy favoring resolution of disputes through the legal system. Neither lower court addressed whether Soaring Pine committed any other act that violated the criminal usury statute, so we leave that issue for consideration on remand.

## A. LEGAL BACKGROUND

When interpreting a statute, this Court's "primary goal is to ascertain and give effect to the Legislature's intent." *Rouch World, LLC v Dep't of Civil Rights*, 510 Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 162482); slip op at 7 (quotation marks and citation omitted). "We begin all matters of statutory interpretation with an examination of the language of the statute." *Nickola v MIC Gen Ins Co*, 500 Mich 115, 123; 894 NW2d 552 (2017). This is because "the most reliable evidence of [the Legislature's] intent is the plain language of the statute." *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 360-361; 917 NW2d 603 (2018).

---

[38] While it is not entirely clear on what basis the circuit court concluded that Soaring Pine violated the criminal usury statute, during its oral decision the court referred to an unpublished Court of Appeals decision in which the circuit court held (and the Court of Appeals accepted) that "plaintiff's complaint sought a criminally usurious amount of interest." *Karel*, unpub op at 2. Thus, it appears the circuit court concluded that seeking to collect a usurious interest rate in this lawsuit was the behavior that violated the criminal usury statute. In any event, the Court of Appeals interpreted the circuit court's decision in this manner and affirmed on that basis. *Soaring Pine Capital*, 337 Mich App at 546, 551.

34

In determining legislative intent, this Court reads the statutory language "in the light of history and common sense," *Honigman Miller Schwartz & Cohn LLP v Detroit*, 505 Mich 284, 313; 952 NW2d 358 (2020), and "in the light of previously-established and recognized rules of the common law," *Benge v Mich Nat'l Bank*, 341 Mich 441, 452; 67 NW2d 721 (1954). When deciding between textually supportable interpretations, this Court will also consider which interpretation "is more consistent with the general legislative plan and purpose." *In re Buckley's Estate*, 330 Mich 102, 119; 47 NW2d 33 (1951); see also, e.g., *People v Sharpe*, 502 Mich 313, 330; 918 NW2d 504 (2018); *Griffin v Trumbull Ins Co*, 509 Mich 484, 507; 983 NW2d 760 (2022); *In re Erwin*, 503 Mich 1, 19-20; 921 NW2d 308 (2018) (relying on the "overall context and manifest purpose" of the statute when determining how to define a statutory phrase).

Moreover, although raised here in a civil case, MCL 438.41 is a criminal statute, the violation of which is a felony that could result in a fine and up to five years' imprisonment. Thus, the general rules for interpreting criminal statutes apply. In interpreting a criminal statute, we are mindful of the due-process requirements of fair notice and the related well-established rule of interpretation that the scope of a criminal offense must be clearly stated. See, e.g., *People v Pinkney*, 501 Mich 259, 268; 912 NW2d 535 (2018) (" 'A criminal statute ought to be so plain and unambiguous that "he who runs" may read, and understand whether his conduct is in violation of its provisions.' "), quoting *People v Ellis*, 204 Mich 157, 161; 169 NW2d 930 (1918). Accordingly, we will not uphold criminal liability through a "strained . . . interpretation" of statutory language. *People v Moss*, 509 Mich 253, 266; 984 NW2d 23 (2022).

## B. ANALYSIS

In determining whether knowingly seeking to collect a usurious interest rate in a civil action is a criminal offense,[39] we begin with the statutory language. MCL 438.41 provides that it is a crime if a lender "knowingly charges, takes or receives" a usurious interest rate. The Court of Appeals seemed to view Soaring Pine's civil collection action as an attempt to "take[] or receive[]" a usurious interest rate. *Soaring Pine Capital*, 337 Mich App at 551. This is, at best, a strained interpretation of MCL 438.41. One who seeks to collect on a debt in a civil suit is not attempting to "take" anything. Rather, that party is seeking payment of the debt through court order, and a court will only provide such an order if it is legally and factually supported.[40] Moreover, one who seeks a usurious rate in a lawsuit should never actually "receive[]" this rate because the opposing party and the judicial system provide a check on this occurring. This is not a situation in which a lender has actually received a usurious interest rate via a lawsuit through fraud on the court or otherwise. Rather, it is the mere act of *seeking* such recovery through this lawsuit that the lower courts held was a crime. The statutory language does not clearly indicate that the Legislature intended to impose criminal liability for this behavior alone.

---

[39] Soaring Pine disputes the lower courts' holdings that it is knowingly seeking to collect a usurious interest rate in this action. We express no view on this point. Rather, for the purposes of this opinion we assume that Soaring Pine is knowingly seeking to recover a usurious rate through this action and hold that, even if true, this behavior standing alone does not violate the criminal usury statute.

[40] For the same reason, a party in such circumstances has not "charge[d]" a usurious interest rate under MCL 438.41.

36

This conclusion is further supported by the public policy favoring resort to the legal system. While not absolute, this Court has recognized "a public policy of encouraging free access to the courts." *Friedman v Dozorc*, 412 Mich 1, 27; 312 NW2d 585 (1981). This public policy reflects the ideal that

> [f]ree access to the courts as a means of settling private claims or disputes is a fundamental component of our judicial system, and courts should be open to litigants for the settlement of their rights without fear of prosecution for calling upon the courts to determine such rights. [*Schunk v Zeff & Zeff, PC*, 109 Mich App 163, 171; 311 NW2d 322 (1981), quoting *Lyddon v Shaw*, 56 Ill App 3d 815, 821; 372 NE2d 685 (1978) (quotation marks and asterisks omitted).]

This public policy is supported by the common-law litigation privilege, which generally provides that "[s]tatements made during the course of judicial proceedings are absolutely privileged, provided they are relevant, material, or pertinent to the issue being tried." *Maiden v Rozwood*, 461 Mich 109, 134; 597 NW2d 817 (1999). "The purpose of absolute immunity under the judicial proceedings privilege, as it applies to attorneys, is to promote the public policy 'of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients.' " *Oesterle v Wallace*, 272 Mich App 260, 265; 725 NW2d 470 (2006), quoting 3 Restatement Torts, 2d, § 586, comment *a*, p 247. Imposing criminal liability for simply seeking relief in court would chill both free access to the courts and the ability of attorneys to seek a legal remedy for their clients. In the absence of clearer language, we do not presume the Legislature intended such a result.

Finally, the lower courts' interpretation of MCL 438.41 would undermine the statute's purpose of protecting borrowers. The practical result of potential criminal liability for bringing a civil collection action would be to discourage lenders from invoking the

judicial process to recover unpaid debts, raising the specter that lenders will instead engage in self-help[41] or other less-savory collection methods. Cf. 15 USC 1692(a) ("There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."). Usury is generally understood to be an affirmative defense. See *Shaw Investment Co v Rollert*, 159 Mich App 575, 580; 407 NW2d 40 (1987). This means that, absent seeking a declaratory action, it may only be raised once a civil suit has been filed. Discouraging civil collection actions would, paradoxically, prevent borrowers from invoking the protections of the law. Further, the legal process protects borrowers from abusive collection activities, both in terms of the collection amount and method. See, e.g., MCR 3.101 (providing the procedure for collecting on a judgment). Considering the usury statutes' primary purpose "to protect the necessitous borrower from extortion," *Lee*, 447 Mich at 557 (quotation marks and citation omitted), we believe it is unlikely that the Legislature intended to incentivize lenders to avoid the legal process in favor of self-help. Cf. *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 503-504; 418 NW2d 381 (1988) (noting a public policy against encouraging resort to self-help).

This is not to say that a borrower is without a remedy if a lender knowingly seeks to collect a usurious interest rate in a civil action. A party who is subject to a frivolous collection action may seek sanctions under MCR 2.625 and MCL 600.2591. In certain circumstances, a borrower may also be able to bring a civil action against a lender, such as a common-law action for abuse of process. See *Friedman*, 412 Mich at 30. However,

---

[41] "Self-help" is "[a]n attempt to redress a perceived wrong by one's own action rather than through the normal legal process." *Black's Law Dictionary* (11th ed).

seeking to collect a usurious interest rate in a civil collection action, standing alone, is not a criminal offense for usury under MCL 438.41 and therefore cannot form the basis for invoking the wrongful-conduct rule when defending a civil action. See *Orzel*, 449 Mich at 558 (explaining that the wrongful-conduct rule may preclude a civil cause of action if "in order to establish his cause of action, [a plaintiff] must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party") (quotation marks and citation omitted).

## V. CONCLUSION

The lower courts erred by holding that Soaring Pine violated the criminal usury statute in this action. Additionally, these courts applied an incorrect standard when determining whether the note in this case was usurious. We reverse the decisions of both courts to the extent that they are inconsistent with this opinion, vacate the remainder of these decisions, and remand this case to the Oakland Circuit Court for reconsideration of all aspects of this case in light of this opinion.

Megan K. Cavanagh
Elizabeth T. Clement
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden

39

SOARING PINE CAPITAL REAL
ESTATE AND DEBT FUND II, LLC,

        Plaintiff/Counterdefendant-
        Appellee/Cross-Appellant,

v                                                                 No. 163320

PARK STREET GROUP REALTY
SERVICES, LLC, PARK STREET GROUP,
LLC, and DEAN J. GROULX,

        Defendants/Counterplaintiffs-
        Appellants/Cross-Appellees.

---

VIVIANO, J. (*concurring*).

I agree with the majority's holdings and the standard it adopts with regard to the enforceability of usury savings clauses. I write separately, however, because I do not believe the majority's extended analysis of our usury laws and the broad purposes they serve is necessary in this case. Rather, the majority's core logic suffices to resolve the matter before us. Our usury statutes bar any "seller or lender" who charges usurious interest from recovering "any interest, any official fees, delinquency or collection charge, attorney fees or courts costs . . . ." MCL 438.32. Accordingly, when a loan agreement imposes a usurious interest, the seller or lender cannot collect any interest.

A usury savings clause circumvents the statutory penalties for charging usurious interest. When the contract is usurious on its face, the only function of the savings clause is to bring the interest rate down to the maximum if the usury is challenged. It thus allows

the lender to "charge usurious rates with impunity by making that rate conditional upon its legality and relying upon the illegal rate's automatic rescission when discovered and challenged by the borrower." *Swindell v Fed Nat'l Mtg Ass'n*, 330 NC 153, 160; 409 SE2d 892 (1991). In other words, it facilitates usury by removing any consequence for charging a usurious rate. Either the illegally high rate goes unchallenged and is collected or the lender gets the legal maximum. But the lender or seller has no reason to fear the statutory prohibition in MCL 438.32 even when charging usurious interest.

That savings clauses conflict with the statute is further demonstrated by the statutory history. In particular, as the majority explains, the Legislature long ago rejected the regime that the clauses would effectuate. The 1843 statutory scheme allowed a lender who charged a usurious rate to collect the maximum legal interest. 1843 PA 47, § 2. That scheme, like a usury clause, allowed lenders to charge usurious rates and, at worst, collect the legal maximum. But the Legislature has rejected this approach since 1891, when it prohibited the collection of any interest on usurious loans. 1891 PA 156, § 2. Enforcing savings clauses to save facially usurious loans would effectively abrogate this legislative decision.

The situation is different when the interest rate is not facially usurious but is variable and might rise above the legal limit based on future contingencies or events that occur after the parties enter into the loan agreement. In such agreements, a savings clause properly addresses this uncertainty by establishing the parties' intention to ensure compliance with the usury laws rather than to undermine them. See *First State Bank v Dorst*, 843 SW2d 790, 793 (Tex App, 1992) ("[A] savings clause may cure an open-ended contingency

2

provision the operation of which *may or may not* result in a charge of usurious interest.").[1]

But the parties can have no such intention to ensure the legality of the loan when the interest rate charged is, from the inception, illegal.  In those circumstances, it is not possible for the agreed upon interest rate to become legal unless the borrower challenges the usurious rate and the lender invokes the savings clause.

For these reasons, I agree with the majority that usury savings clauses are unenforceable when the loan agreement is facially usurious.[2]  Because enforcement of the clauses in that circumstance represents such a clear conflict with the statutory framework, I believe the clauses are unenforceable.  Consequently, I see no need to go further in

---

[1] The majority suggests that for the clause to be enforceable, the future events must be "outside the control of the parties . . . ."  The thought behind this restriction, no doubt, is that if the lender controls whether the rate is usurious, then the lender will opt for the higher rate, and the situation is thus little different than if the original agreement was for a usurious rate.  The majority cites no support for this restriction, and I see no reason to impose it now, especially when we are not addressing such contingencies in this case.  It is noteworthy, however, that the majority's restriction also appears to apply to the borrower's actions.  Consequently, a usury savings clause would be unenforceable, and the borrower would owe no interest, if the borrower itself took the action to push the interest rate above the legal limit.  This could give borrowers a windfall.  In any event, I would not now decide whether, and to what extent, a party's control over the contingency affects the enforceability of a savings clause.

[2] I also agree with the majority that the rate of interest must be determined by the substance of the parties' agreement rather than the stated interest rate.  See *Abeloff v Ohio Fin Co*, 313 Mich 568, 577; 21 NW2d 856 (1946) (explaining that, to determine whether a transaction was a usurious loan, we must "examin[e] the entire transaction" and "are not bound by the form of the transaction," no matter how it is characterized by the parties in their contract).  Further, I agree that the criminal usury statute, MCL 438.41, does not apply to an effort to collect an unlawful interest rate through a lawsuit alone.  By its terms, the statute applies when a lender "knowingly charges, takes or receives" usurious interest.  MCL 438.41.  A lender who brings suit to collect on interest is not thereby charging interest.  Nor is it taking or receiving usurious interest, because the lender will be able to obtain through the proceedings only the interest to which it is entitled.

establishing broader public policies emanating from the statutes or other authorities in order to resolve the case.[3]  Accordingly, I concur.

David F. Viviano
Brian K. Zahra

---

[3] By determining public policy on the basis of a close reading of the statutes, their operation, and textual history—which is all that is needed in this case—I would avoid the danger of allowing the subjective preferences of judges to create public policy.  See *Terrien v Zwit*, 467 Mich 56, 66; 648 NW2d 602 (2002) ("In defining 'public policy,' it is clear to us that this term must be more than a different nomenclature for describing the personal preferences of individual judges, for the proper exercise of the judicial power is to determine from objective legal sources what public policy *is*, and not to simply assert what such policy *ought* to be on the basis of the subjective views of individual judges.").

STATE OF MICHIGAN

SUPREME COURT

SOARING PINE CAPITAL REAL
ESTATE AND DEBT FUND II, LLC,

        Plaintiff/Counterdefendant-
        Appellee/Cross-Appellant,

v                                  No. 163320

PARK STREET GROUP REALTY
SERVICES, LLC, PARK STREET GROUP,
LLC, and DEAN J. GROULX,

        Defendants/Counterplaintiffs-
        Appellants/Cross-Appellees.

---

WELCH, J. (*concurring*).

I agree with the majority opinion that "Michigan statutes impose a bright-line interest-rate ceiling on certain loans" and "that—where usury protections do apply—the public policy of this state is to protect borrowers from unlawful interest rates by placing the primary burden on lenders to ensure that loans are not usurious." I also agree with the majority's thorough analysis as to when usury savings clauses can or cannot be used.

I write separately to note the incongruent result that courts are potentially forced to reach today due to the Legislature's choices and carveouts for certain entities that have historically charged extremely high interest rates.[1] The public-policy reasons behind usury

---

[1] On remand, the court will have to decide whether and to what extent Park Street Group is covered by usury prohibitions in Michigan. I write separately to note that private debt funds are not explicitly carved out as exceptions to those usury protections.

prohibitions are well known, and the majority opinion sets them out well. Specifically, usury laws exist "to protect the necessitous borrower from extortion." *Wilcox v Moore*, 354 Mich 499, 504; 93 NW2d 288 (1958); *Allan v M & S Mtg Co*, 138 Mich App 28, 38; 359 NW2d 238 (1984) ("The Michigan courts have long recognized that the purpose of the law of usury is to protect the necessitous borrower."); *Lindsay v Covenant Mgt Group, LLC*, 561 F3d 601, 604 (CA 6, 2009) (finding under Michigan law that the "typical aim" of usury is "to protect the necessitous borrower from extortion . . . [which does] not pertain to sophisticated borrowers taking out million-dollar business loans") (quotation marks and citation omitted).

Those policy considerations *should not* apply to the sophisticated business entities in this case, but as explained by the majority, they do. The borrower, Park Street Group, bought residential properties, renovated the properties, and sold (or "flipped") the homes to investors. Park Street Group is owned by an attorney who has specific knowledge about business loan documents and investment funds like those run by Soaring Pine. Indeed, prior to the business dealing at issue in this case, he was the attorney for Soaring Pine Capital's parent company for many years.

Soaring Pine Capital is a nonbank lender (or private debt fund)[2] that loans funds to borrowers acquiring real estate assets. It loaned Park Street $1,000,000 for Park Street to

---

[2] A private debt fund consists of "investors that raise capital commitments through closed-end funds (like private equity) and make senior loans (like banks) directly to, mostly, middle-market firms." Block et al, *A Survey of Private Debt Funds* (January 2023), p 1, available at <https://bfi.uchicago.edu/wp-content/uploads/2023/01/BFI_WP_2023-10.pdf> (accessed May 2, 2023) [https://perma.cc/VM2D-Q4UU].

add hundreds of homes to its Detroit and Wayne County real estate holdings.[3]  Nonbank lenders internalize more risk than traditional banks when providing direct loans to borrowers.  This risk is built into the loan agreement in the form of higher interest and fees.  See Comment, *Private Equity Lending: Leveling Information Asymmetries Without the Need for Regulation*, 20 Wake Forest J Bus & Intell Prop L 21, 54-55 (2019) (noting that "private-equity firms are very unlikely to receive government bailouts" and therefore "internalize many of the risks they take").  Borrowers who use nonbank lenders understand that the lender is taking a risk loaning money to their business and that the deal is structured to account for that risk.  In fact, companies seeking nonbank loans often cannot obtain a traditional bank loan given the high risk involved.[4]  Nevertheless, the law mandates that we protect *this* borrower while thousands of Michigan consumers are subject to a cycle of debt due to high interest loans provided by businesses that have been exempted from the usury laws.

The current state of Michigan's usury regime fails in many ways to live up to its original intent.  The law currently permits payday lenders to charge interest rates up to an

---

[3] Soaring Pine Capital accuses Park Street Group of fraud in the inducement of the contract, arguing that Park Street Group never intended to use the money to flip houses.  We do not address this claim today.

[4] See *A Survey of Private Debt Funds*, p 2 ("[D]irect lenders charge higher interest rates, lend against cash flow to smaller firms, and provide more flexibility in distress than banks.  This is consistent with private debt funds expanding capital to firms to which banks find too risky to lend.").  Further, private debt investors "structure their investments with risks that banks try to avoid—lack of accounting transparency, low tangible collateral value, and firm sizes too small to qualify for syndication."  *Id*. at 5.

annualized rate of 391%.[5]  In contrast, the annualized loan rate in this case between two sophisticated business entities was, at most, roughly 35%.  Notably, credit cards may charge unlimited interest if issued by banks or other regulated lenders,[6] loans secured by property *other* than single-family homes in excess of $100,000 also have no interest cap,[7] and loans to corporations by banks or other regulated lenders—whether to a small family business or a megacorporation—also have no interest cap.[8]  Additionally, mortgages extended by banks or other federally insured lenders have no interest cap under federal law.[9]

Once the carveouts and exceptions are considered, there is very little protection left for the individual consumers and small businesses that our caselaw historically deemed most worthy of protection.  What we are left with, it seems, is protection for those who least need it—highly sophisticated borrowers who benefit from the simple facts that the

---

[5] MCL 487.2153; see also Michigan Department of Attorney General, *Payday Loans: Know Your Rights* <https://www.michigan.gov/ag/consumer-protection/consumer-alerts/consumer-alerts/credit/payday-loans> (accessed May 2, 2023) [https://perma.cc/R9BQ-JRMQ].

[6] See MCL 445.1854; MCL 445.1857.

[7] MCL 438.31c(11).

[8] MCL 438.61(2); see also Michigan Department of Insurance and Financial Services, *Michigan Statutory Interest Rate Ceilings* <https://www.michigan.gov/-/media/Project/Websites/difs/CF/Misc/Interest_Rate_Ceiling_Table.pdf?rev=0f4d179843734d1997bb02fd1e6e3a68> (accessed May 2, 2023) [https://perma.cc/6CD7-WGBL].

[9] See 12 USC 1709-1a; 12 USC 1735f-7a.  While federal law provides that interest rates on mortgages cannot be capped, Michigan had the power to override the federal statute prior to April 1, 1983, but failed to do so.  See Vandenbrink, *Usury Ceilings and DIDMCA*, 9 Economic Perspectives, Federal Reserve Bank of Chicago 25, 28 (1985) (illustrating in Table 3 that 15 states overrode the federal preemption of their usury statutes).

lender is not considered a "regulated lender" under MCL 445.1854 and the borrower is structured as an LLC. These facts prevent Park Street Group from entering into a loan agreement that charges interest in excess of 25% under MCL 450.4212. While I concur with the majority in this case, it is unclear to me why the Legislature would choose to provide a sophisticated borrower with greater protection from high interest rates than it provides to an average consumer using a payday lender, obtaining a bank loan, or using a credit card. Based on this nonsensical outcome, I encourage the Legislature to review the usury carveouts and determine whom it intends to protect.

Elizabeth M. Welch

5